831 So.2d 835 (2002)
STATE of Louisiana,
v.
Corey D. WILLIAMS.
No. 2001-KA-1650.
Supreme Court of Louisiana.
November 1, 2002.
*838 G. Benjamin Cohen, R. Neal Walker, New Orleans, for Applicant.
Richard P. Ieyoub, Attorney General, Paul Carmouche, District Attorney, Edwin L. Blewer, III, Catherine M. Estopinal, Hugo A. Holland, Jr., Shreveport, for Respondent.
Gabriella Celest, for Juveile Justice Project of LA (Amicus Curiae).
James B. Gardner, Shreveport, for Arc of Louisiana (Amicus Curiae).
Mark D. MacNamara, New Orleans, Counsel for American Association of Mental Retardation.
WEIMER, Justice.
In addition to issues customarily addressed in death penalty cases, this case[1] represents the first time this court must address issues arising from Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), a decision of the United States Supreme Court which prohibited the execution of mentally retarded persons.[2] For the reasons that follow, we *839 affirm the defendant's conviction, pretermit consideration of the penalty phase of defendant's trial, and remand for an evidentiary hearing regarding the determination of whether the defendant is mentally retarded. If the defendant is determined not to be mentally retarded, we maintain jurisdiction to determine whether the death penalty should be imposed in this case. See LSA C.Cr.P. art. 905.9 and La. Sup.Ct. R. 28.[3]

PROCEDURAL HISTORY
On February 11, 1998, a Caddo Parish grand jury indicted defendant, Corey D. Williams, for the January 4, 1998 first degree murder of Jarvis Griffin. On September 4, 1998, the State filed an amended indictment: (1) correcting the spelling of the name of the defendant;[4] and (2) charging with specificity that the first degree murder was based on LSA-R.S. 14:30(A)(1) and occurred while defendant, as a principal with Gabriel Logan, was "engaged in the perpetration and attempted perpetration of the armed robbery, first degree robbery, and simple robbery" of the victim. On February 12, 1998, defendant entered a plea of not guilty.
Thereafter, the State and the defense filed reciprocal discovery motions. On March 23, 27, and 29, 2000, the court conducted a hearing on defendant's motion to suppress his custodial statements, which the court denied. On August 29, 2000, the defense moved to re-open the suppression hearing based on the voluntariness of defendant's confession. The defense argued that subsequent to the court's original ruling, the defense had defendant's intelligence tested by psychologist Dr. Mark Vigen; the test reflected an intelligence quotient (IQ) of 68, indicating a diminished capacity which prevented defendant's waiver of his legal rights from being freely and knowingly given. The State did not object to reopening the rehearing on the motion to suppress to allow the defense the opportunity to introduce the reports concerning the testing. At an October 6, 2000 hearing, the court again denied the motion to suppress.
Defendant's trial commenced on October 23, 2000.[5] On October 27, 2000, the Caddo Parish jury returned the verdict of guilty as charged.[6] At the conclusion of the penalty phase, the jury returned the sentence of death after finding the occurrence of the one aggravating circumstance urged by the State, namely, that the offender was engaged in the perpetration or attempted perpetration of an armed robbery. See LSA-C.Cr.P. art. 905.4(A)(1). Defense counsel filed motions for a new trial as to both the guilt and penalty phases, and a motion for post-verdict judgment of acquittal. On November 20, 2000, the court denied these motions and imposed the sentence of death in accordance with the jury's verdict. Defendant now appeals *840 his conviction and death sentence on the basis of 17 assignments of error.[7]

FACTS
On the night of January 4, 1998, 16-year-old defendant, Corey Williams, and his friend, Chris Moore, were walking in the Queensborough area of Shreveport, Louisiana. When they arrived at 2219 Virginia Street, they noticed that a pizza delivery man was at the home of their friend, Renee Iverson. A group of young people had gathered at Iverson's home, and more arrived in anticipation of sharing in the pizza. Present were Iverson's boyfriend, Nathan Logan; his 16-year-old brother, Gabriel Logan; Trimeka Mack; Derrick White; Walter Shaw; and an individual Iverson knew only as "P."
At the front porch of her house, Iverson paid the delivery man, 23-year-old Jarvis Griffin. She noticed Gabriel Logan, who had exited the house, meet Williams in her front yard. She watched as Gabriel Logan reached under his shirt and passed a gun to Williams. Iverson then reentered her house with the pizzas, and Griffin returned to his car.
Moore, who had approached Iverson's house with Williams, also saw Gabriel Logan hand something to Williams. As Griffin was pulling away in his car, Williams raised a gun, approached the driver's side of the vehicle, and fired several shots. Williams then ran from the scene with the weapon.
After hearing the shots, Iverson and her friends exited the house in time to see Griffin's vehicle roll down the street and veer into the porch at 2603 Darien Street. When the vehicle came to a stop, Gabriel Logan ran to it, pulled the apparently lifeless driver from the car, and began rifling through his pockets. The bystanders watched as Gabriel Logan entered the vehicle and took a green bank bag and a pizza before fleeing the scene with Moore.
The police arrived on the scene. Despite their efforts to save Griffin, he died from internal hemorrhage.[8] The police began interviewing the witnesses, most of whom had been either inside or outside of Iverson's home.
Meanwhile, Nathan Logan, who had also left the scene, encountered Gabriel Logan and Moore in an alley as they were dividing the money from the green bag.[9] The Logans parted company with Moore, and Nathan Logan took his brother home. He later told detectives that as soon as he and his brother, along with another friend, Patrick Anthony, arrived at their home, Williams telephoned Gabriel Logan and told him that the gun was in the barbecue pit outside his mother's house.
The Logans and Anthony[10] retrieved the gun; they cleaned it, placed it inside a bag, and hid the bag near their apartment *841 complex. They disposed of the pizza box and the green bank bag in a nearby dumpster. Nathan Logan later escorted police to retrieve these pieces of evidence.
Firearms identification experts tested the .25 caliber semi-automatic handgun and determined that the bullets retrieved from Griffin's body and car had been fired by that weapon. Nathan Logan's fingerprints were found on the empty clip of the weapon.
As a result of the witnesses' statements, the police arrested Williams and Gabriel Logan within hours of the shooting. The detectives advised defendant of his rights in the presence of his mother, Dorothy Williams, and defendant gave a recorded statement in which he claimed that Gabriel Logan shot the victim. Defendant's first statement was taken at approximately 5:47 a.m. on January 5, 1998. Ms. Williams returned home.
In a separate room, Gabriel Logan was advised of his rights, and he refused to give a statement to the police. During the time the officers were completing defendant's arrest paperwork, defendant told Det. Gryder that he wanted to tell them what really happened. After defendant re-initiated the interview, the police returned Ms. Williams to the station.
The officers reminded defendant that he had already been advised of his rights, and they proceeded to take the second statement at 8:30 a.m. In the presence of his mother, defendant confessed to shooting the victim, providing the following details. Defendant admitted that he and Gabriel Logan decided to "get a lick," meaning that they wanted to rob the pizza delivery man. With gun in hand, defendant approached Griffin and said, "[G]ive me the money." When Griffin turned sideways, apparently reaching for the money, defendant believed he may have been about to pull a gun, so he shot him. Defendant stated that afterwards, he ran home and hid the gun in the barbecue pit on the porch.
At trial, the jury heard defendant's two statements. Defendant did not testify at either the guilt or penalty phases of his trial.

DISCUSSION
1. Unmet request for counsel.
Defendant claims the trial court precluded him from introducing at trial evidence that he had requested an attorney before custodial questioning and that the request was denied.
A review of the record of the hearing on the motion to suppress provides background for this issue. Defendant testified at the hearing on the motion to suppress held on March 27, 2000. On direct, defendant acknowledged that the officers read him his rights before he gave his first statement, that he and his mother were given an opportunity to discuss those rights privately, and that he understood those rights. However, defendant indicated he "asked for a lawyer, but they told me that I couldn't have one because it was too early in the morning." Defendant indicated that he went ahead and made the first statement to police. On cross-examination, the prosecutor elicited from defendant that he requested counsel prior to the first statement, but he did not mention he was denied counsel on the first recording. Defendant also testified only he and two detectives were present when he asked for counsel.
The March 27, 2000 hearing was recessed because the defense wanted to call defendant's mother, who had been in court earlier, but had since disappeared. Two days later, the court resumed the motion hearing. Ms. Williams's rendition of the *842 scenario surrounding the request for a lawyer was markedly different from that of her son. Ms. Williams repeatedly said the request for counsel came before the second statement, not the first statement; she told the judge that she was definitely present when her son asked for a lawyer, and the two detectives were also present. She stated she had asked for counsel prior to the recording of the second statement, but she could not explain why she and her son had not asked for a lawyer while the tape was running.
At the hearing on the motion to suppress, the defense took the position that both of defendant's statements should be suppressed: the first, because questioning should have stopped when defendant invoked his right to counsel before the first statement; the second, because Ms. Williams's request for a lawyer before the second statement "negate[d]" the second statement. These grounds for suppression, namely that the statements were taken in violation of defendant's right to have counsel present,[11] were not the same grounds counsel had advanced in the motion itself. In the motion, counsel claimed that defendant, and his mother, did not understand the rights in order to make an intelligent waiver, and that the statement was the product of police coercion, in that the police told defendant that Gabriel Logan told them defendant was the shooter.
The court denied the motion to suppress, having reviewed the waiver of rights form signed by defendant and his mother. The court noted the officers testified that defendant and his mother were read their Miranda[12] rights, understood them, and freely elected to waive those rights and make a statement. The court found the testimony of defendant and his mother, in which they claimed to have invoked the right to counsel, to be a "surprise" in that these allegations were not made in the motion to suppress. The court further noted that Ms. Williams waited until the hearing in March 2000 to disclose to her son's lawyers that she had also invoked her son's right to counsel during questioning. The court found this late disclosure suspect, coming over two years from the date of the arrest and the taking of the statements.
Finally, the judge also considered that, during the time defendant was making his custodial statements, co-defendant Gabriel Logan was advised of his rights and, invoking his right to counsel, refused to give a statement; that invocation was respected by the police. The court concluded that had defendant invoked his right to counsel the officers would have honored his invocation as well as that of the co-defendant.
A defendant's right to counsel is guaranteed in LSA Const. art. I, § 13. When counsel is requested, interrogation must cease; officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney. Minnick v. Mississippi, 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990). If before or during interrogation an accused asks for counsel, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated, custodial interrogation even if he has been advised of his rights. Such an accused is not subject to further interrogation by the authorities until counsel is present, unless the accused himself initiates further communication, *843 exchanges, or conversations with the police. Edwards v. Arizona, 451 U.S. 477, 485, 101 S.Ct. 1880, 1884-1885, 68 L.Ed.2d 378 (1981).
In the instant case, the trial court did not believe the testimony of defendant and his mother with respect to an invocation of the right to counsel. Without an actual invocation, the protections of Edwards are not implicated. A thorough review of the testimony surrounding this issue supports the trial court's finding.
During trial, the issue resurfaced when the defense sought to inform the jury of the circumstances surrounding defendant's confession, namely that he purportedly invoked the right to counsel. Admissibility of a statement is first a question for the trial court, and its conclusions on the credibility and weight of testimony relating to voluntariness of a statement will not be overturned on appeal unless not supported by the evidence. State v. Burkhalter, 428 So.2d 449, 454-55 (La.1983). Here, the trial court considered LSA-C.Cr.P. art. 703(G)[13] and held that the issue of voluntariness was decided at the motion to suppress, and thus was res judicata.
The trial court erred. The fact that a defendant requested and was denied counsel is a consideration bearing on the voluntariness of any subsequent statement. Minnick, 498 U.S. at 151, 111 S.Ct. at 489. In the instant case, there was no abuse of discretion in the trial court's finding, for purposes of determining the admissibility of the statement, that the police testimony on point was more credible than the testimony given by the defendant and his mother. However, LSA-C.Cr.P. art. 703(G) gives the defendant the right to place before jurors his version of the interrogation for them to consider in assessing the weight and reliability of his statement. This statutory rule has its underpinnings in the Due Process Clause and it necessarily operates independently of any credibility determinations the trial court may have made in ruling on the voluntariness of a statement as a matter of law. Crane v. Kentucky, 476 U.S. 683, 689, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) ("[R]egardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.") (Emphasis added.)
Nevertheless, the court's error does not warrant reversal of defendant's conviction. Even assuming the jurors would have found the testimony from defendant's mother more credible than the testimony of the police concerning the request for counsel, the evidence was clear that the defendant's critical second statement was not the product of an overbearing incommunicado interrogation; the police had defendant's *844 mother present at both statements. See State v. Fernandez, 96-2719, p. 8 n. 5 (La.4/14/98), 712 So.2d 485, 489. Moreover, while the defendant (at least by his own account and that of his mother) may have been denied the guiding hand of counsel, the evidence was clear that the defendant reinitiated contact with the police after his first, partially exculpatory, statement because he "felt bad" about what he had done, and then confessed to shooting the victim at close range. Even according due weight to the defendant's limited intellectual resources, counsel was not needed to advise him that he was confessing to murder. Cf. Escobedo v. Illinois, 378 U.S. 478, 486, 84 S.Ct. 1758, 1762, 12 L.Ed.2d 977 (1964). Finally, the substance of defendant's statement dovetailed with the accounts given by the other eyewitnesses on the scene. Although the defendant's second statement provided his critical admission that he had shot the victim in an attempt to rob him, an inference of that intent rose ineluctably from the known circumstances of the crime.
Under these circumstances, it is unlikely jurors would have viewed the reliability of defendant's statement in a different light even if they had received and credited evidence from defendant's mother, or perhaps the defendant himself, involving the supposed request for counsel. This part of his argument lacks merit.

2. Denial of defense challenge for cause of juror who became foreperson.
Defendant avers that several trial court rulings during voir dire skewed the jury toward the death penalty and deprived him of his right to exercise peremptory challenges, his right to a fair and impartial jury, and his right to a reliable determination of sentence. Thus, defendant complains that the trial court's rulings violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as Article I, §§ 16, 17, and 20 of the Louisiana Constitution of 1974.
The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). See Witherspoon v. Illinois, 391 U.S. 510, 515, 88 S.Ct. 1770, 1773, 20 L.Ed.2d 776 (1968) (holding that a prospective juror who would vote automatically for a life sentence is properly excluded); see also Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). In a "reverse-Witherspoon" context, the basis of the exclusion is that a prospective juror "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him." State v. Robertson, 92-2660, (La.1/14/94), 630 So.2d 1278, 1284.[14] Jurors who cannot consider both a life sentence and a death sentence are "not impartial," and cannot *845 "accept the law as given ... by the court." LSA C.Cr.P. art. 797(2),(4); State v. Maxie, 93-2158, p. 16 (La.4/10/95), 653 So.2d 526, 534-35. In other words, if a prospective juror's views on the death penalty are such that they would "prevent or substantially impair the performance of duties in accordance with the instructions [or] the oath," whether those views are for or against the death penalty, he or she should be excused for cause. State v. Taylor, 99-1311, p. 8 (La.1/17/01), 781 So.2d 1205, 1214, cert. denied, 534 U.S. 844, 122 S.Ct. 106, 151 L.Ed.2d 64 (2001).
A trial court is vested with broad discretion in ruling on challenges for cause and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Cross, 93-1189, p. 7 (La.6/30/95), 658 So.2d 683, 686. Prejudice to the defendant by a trial judge's rulings is presumed when a challenge for cause is denied erroneously by a trial court and the defendant ultimately exhausts his peremptory challenges. Robertson, 630 So.2d at 1280. In the instant case, defendant exhausted his peremptory challenges, and therefore, need only show that the trial court abused its discretion by denying his challenges for cause. Id., at 1281.
An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. Cross, 93-1189 at 6, 658 So.2d at 686. "[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990).
The grounds for which a juror may be challenged for cause are set forth in LSA-C.Cr.P. art. 797. Two of these grounds are pertinent here, namely, that "[t]he juror is not impartial, whatever the cause of his partiality," and "[t]he juror will not accept the law as given to him by the court." LSA-C.Cr.P. art. 797(2) and (4).
The defense argument we address here is based on a perceived inability of a juror to accept the law of mitigating circumstances as listed in LSA-C.Cr.P. art. 905.5. Defendant argues the trial court erred by denying defense challenges for cause as to four prospective jurors[15] who, he alleges, refused to consider "bad childhood" as a mitigating circumstance. Although these prospective jurors stated they would consider the statutory mitigating circumstances, they also generally adhered to the view that a bad childhood did not "excuse" a defendant's criminal behavior. As "bad childhood" is not one of the listed mitigating factors in LSA-C.Cr.P. art. 905.5, it must be considered as one of the "catchall" factors, "any other relevant mitigating factor." LSA-C.Cr.P. art 905.5(h).
After careful review of the voir dire testimony of Ms. Fertitta, who ultimately became the jury's foreperson, this court concludes the record supports the trial court's decision to deny the defense's cause challenge against her.
Ms. Fertitta was questioned during the Witherspoon voir dire along with 18 other prospective jurors, 7 of whom were excused after questioning by the *846 prosecution. Ms. Fertitta indicated she believes in the death penalty, although she called it "a tough decision." When asked by the prosecutor to place herself on a scale from zero to ten, with zero being completely opposed to capital punishment and ten being automatic death, she assessed herself at "maybe an eight," indicating that she could vote for the death penalty "[i]f I didn't have a shadow of a doubt" that the defendant committed the crime. She also stated she could impose the death penalty on a 16-year-old.
Then, in response to an explanation by defense counsel, Ms. Fertitta indicated she understood the death penalty was not required and a life sentence for someone convicted of first degree murder was an option. Defense counsel also explained that the law makes consideration of mitigating circumstances mandatory at the penalty phase of the trial and he read to the panel the list of mitigating circumstances on the chart placed before them.[16] LSA-C.Cr.P. art. 905.5. In explaining section (h) of the statute, defense counsel stated there were a lot of things that could fit into that section, specifically: "Whether or not a person had a terrible home life as a baby or has a defect or something that [is] a result of their environment as they were growing up, which gave rise to their... family life being ... dysfunctional." Subsequent to that explanation, Ms. Fertitta stated she could be "open" to all the mitigating circumstances and would "be open to the facts, take all into consideration." She could consider the sentence of life imprisonment without the possibility of parole as the appropriate sentence. She expressed a belief in the Ten Commandments, an accountability for personal actions, and a credo of "Do unto others as you would have them do unto you."
However, when defense counsel delved into her views on situations where the death penalty should not be imposed, Ms. Fertitta responded:
MS. FERTITTA: I think what the mitigating circumstances are, some things, yes. The state of mind the person was in, do they clearly have an understanding of what they were doing. I don't think that how you are brought up and your surroundings should come into that. I think
DEFENSE COUNSEL: Well, let me go back. You couldn't adopt the bottom one then, the relevant mitigating circumstance of how you were brought up?
PROSECUTOR: Your Honor, I am going to object to that question, because, first of all, the law says a relevant mitigating circumstance. There is no requirement that any juror put any particular weight on any mitigating circumstance, and it is up to each juror to decide for themselves, after hearing evidence, of what's relevant and what's not. I think the question calls for some sort of commitment on the part of this particular juror. I would ask that it be phrased in a proper manner.
THE COURT: Sustained. Why don't you rephrase the question.
DEFENSE COUNSEL: Ms. Fertitta, do you think that a person's family life, the way they grew up, is a relevant mitigating circumstance?
MS. FERTITTA: Not to me.
After that response, defense counsel did not ask Ms. Fertitta any more questions. *847 During the selection session at the bench, counsel sought to excuse Ms. Fertitta for cause.[17] The judge denied the defense cause challenge, stating that "while she may have a personal viewpoint with regard to the issue of a bad childhood that ... does not mean she would not consider all of the defense['s] mitigating factors."
At the bedrock of the United States Supreme Court's evolving capital punishment jurisprudence over the past quarter century is the principle that "the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the offense." Penry v. Lynaugh, 492 U.S. 302, 327-328, 109 S.Ct. 2934, 2951, 106 L.Ed.2d 256 (1989). Accordingly, "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." Buchanan v. Angelone, 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998) (Emphasis supplied.) A difficult family history and an emotional disturbance are well recognized mitigating circumstances typically introduced in some cases; such evidence may properly be given little weight. Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982).
At the voir dire stage of the trial, the prospective juror has no indication of what weight evidence of family history and emotional disturbance will receive in light of other factors of the case. While the defendant may not commit a prospective juror to according any particular weight to the evidence he might offer, a juror must commit himself or herself to keeping an open mind with respect to not only the statutory mitigating circumstances, but also any non-statutory circumstance the defendant proffers as the basis for returning a sentence less than death. We note that defense counsel did not demonstrate to the trial court that Ms. Fertitta would exclude consideration of the mitigating factor of defendant's family history. Perhaps counsel's rather vague questioning of Ms. Fertitta resulted from the court's sustaining the State's objection; defense counsel did not preserve an objection to this particular ruling. We note Ms. Fertitta's answers to defense counsel's question concerning "the way [the defendant] grew up" came after the State objected to defense counsel's seeking a commitment from the prospective juror. Compare the more specific question defense counsel asked of another prospective juror who was on the same panel as Ms. Fertitta: "You would be open-minded even if we got to the second phase, the penalty phase of the trial, you could be open-minded to these circumstances and any thing else that we could show you that would individualize the defendant as a person?" Answer: "Yes."
That Ms. Fertitta, during voir dire and in the abstract, rejected family history as a mitigating circumstance did not necessarily mean that she would not consider actual proof during the penalty phase of a salient component of that family history, i.e., the fact that as the result of parental abandonment and neglect, the defendant had consumed lead paint in sufficient quantities to have poisoned his system and caused brain damage, which could qualify as a statutory mitigating circumstance. LSA-C.Cr.P. art. 905.5(e) ("At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication.")
*848 The trial court was convinced by the entirety of Ms. Fertitta's responses that the juror's "personal viewpoint with regard to the issue of a bad childhood ... in an isolated context" did not mean that "she would not consider all of the defense mitigating factors." Given the breadth of discretion traditionally accorded a trial judge's rulings on cause challenges, the ruling with regard to Ms. Fertitta withstands scrutiny on appeal. See State v. Lee, 93-2810, p. 9 (La.5/23/94), 637 So.2d 102, 108. (A trial judge is accorded broad discretion in ruling on cause challenges because he or she "has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning by the parties' attorneys.")
As Ms. Fertitta ultimately served on the jury, she had the benefit of the court's instructions to the jury following the penalty phase, in which the judge quite clearly ordered the jurors that they "must also consider any mitigating circumstances before you decide that a sentence of death should be imposed." The judge then read the statutory mitigating circumstances under LSA-C.Cr.P. art. 905.5(a)-(h), and then added that in addition to the list just read "you must also consider any other relevant mitigating circumstance. You are not limited only to these mitigating circumstances which are defined. You may consider any other relevant circumstances which you feel should mitigate the severity of the penalty to be imposed."
This assignment of error is without merit.

3. Insufficient evidence to convict.
In two assignments of error, defendant asserts that there was insufficient evidence to convict him of first degree murder. Specifically, defendant claims that the evidence did not establish that the killing occurred when he was engaged in an armed robbery. Likewise, as the State relied on this single aggravating circumstance, defendant also claims that insufficient evidence supports his death sentence.
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).... [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.
State v. Captville, 448 So.2d 676, 678 (La. 1984).
In the instant case, the State proceeded to trial against defendant for first degree murder and had the burden to prove the offender had specific intent to kill or to inflict great bodily harm and was engaged in the perpetration or attempted perpetration of an armed robbery in violation of LSA-R.S. 14:30(A)(1).[18] Specific *849 criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). Although specific intent may be proven by direct evidence, such as by statements of the accused, it is a question of fact and may be inferred from the circumstances surrounding the offense and the conduct of the defendant. See, e.g., State v. Boyer, 406 So.2d 143, 150 (La.1981). Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Williams, 383 So.2d 369, 373 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 828 (1981). In addition, the State also charged defendant as a principal, acting in concert with Gabriel Logan.[19] As such, the State had to demonstrate that defendant had the requisite specific intent, not merely that he knew of Gabriel Logan's intentions.
To prove these elements, the State introduced defendant's own taped statements in which he admitted that he and Gabriel Logan decided to "get a lick" on the pizza delivery man, meaning that they both decided to rob the victim. In his second statement, defendant informed the police that Logan had given him a gun moments earlier, and defendant pointed it at the victim and said, "Give me the money." When defendant saw the victim turning and reaching, he interpreted that gesture to mean the victim might be reaching for a gun, instead of the money he had just demanded, so he shot three times, indicating: "I wasn't fixing to get killed." Afterwards, defendant ran off.
Renee Iverson's testimony corroborated defendant's second statement. She stated that as she was at her front door paying the delivery man for the pizzas, she observed Gabriel Logan exit her house, walk into her yard, and hand defendant a gun from under his shirt. Iverson also recalled that after she heard three shots, she reopened her front door and looked outside, where she saw the Pizza Hut delivery man's car hit her neighbor's house. At that point, she stated that she observed Gabriel Logan go over to the car, pull the victim from the car, and commence going through his pockets. She noted that Logan had something in his hand when he exited the victim's car.
Chris Moore also testified that he was outside the Iverson home at the time of the shooting. He saw Gabriel Logan come out of the house and approach defendant, handing him something. He observed defendant approach the driver's side and shoot three or four times, then run off toward his grandmother's house. At that point, the victim's car drifted into a neighboring house. He then saw Gabriel Logan pull the victim from the car.
Walter Shaw testified that he had been at Iverson's home and exited when he heard the shots. He saw Gabriel Logan pull the victim from the car and go toward his shoes. He stated that Logan had a pizza box in his hand when he got out of the car.
Nathan Logan, the older brother of Gabriel Logan, testified that after the shooting, *850 he encountered his brother and Moore in an alley, dividing up the money that had been in the green bank bag taken from the victim. After Nathan escorted his brother home, his brother got a phone call. The two brothers and Patrick Anthony immediately went to defendant's house. Nathan Logan recalled that Gabriel retrieved the murder weapon from the barbecue pit outside defendant's house. Gabriel handed the gun to Anthony to clean. Nathan Logan recalled that Anthony put the gun in a bag and placed it beside a pole. They also disposed of the pizza box and green bank bag in a nearby dumpster. Later that night, Nathan Logan led police to the dumpster and the utility pole where all of this evidence was retrieved.
The State also relied upon the testimony of Dr. George McCormick, the coroner of Caddo Parish. He testified that he performed the autopsy on the victim, Jarvis Griffin, on January 5, 1998, and ruled the cause of death as a gunshot wound. The course and track of the bullet penetrated the victim's left arm, severed the aorta, passed through the major artery from the heart to the lungs, passed through both lungs, and penetrated the tip of one of the chambers on the left side of the victim's heart. Ultimately, the victim died from internal hemorrhaging as a result of the gunshot wound.
The State's evidence supported a principals theory that both defendant and Gabriel Logan embarked on a joint effort to rob the victim at gunpoint. In his second statement, defendant confirmed that both he and Gabriel Logan planned the armed robbery. By his own admission, defendant committed an act in furtherance of that plan, namely that, at gunpoint, he demanded money from the victim. Thus, the jury could reasonably infer that at the time of the shooting, defendant was engaged in the perpetration of an attempted armed robbery. LSA-R.S. 14:30(A)(1). The evidence showed that Gabriel Logan completed the robbery plan by retrieving the green bank bag and pizza from the victim's vehicle after the shooting. The evidence further showed that defendant specifically intended to kill or inflict great bodily harm when he stood right beside the driver's window and fired three gunshots from close range at the victim.
Defendant's reliance on State v. Bright, 98-0398 (La.4/11/00), 776 So.2d 1134 is misplaced. In Bright, this court reversed a first degree murder conviction and death sentence based on insufficient evidence of the shooter's identity; there was insufficient evidence that the shooter was the same person who removed an envelope containing cash from the victim. In that case, the State's evidence of an armed robbery was circumstantial. This court found the State's case did not exclude beyond a reasonable doubt the defendant's reasonable hypothesis of innocence, namely that someone else took the victim's money after Bright shot him. Accordingly, this court reduced the defendant's conviction to specific intent second degree murder, under LSA-R.S. 14:30.1(A)(1). Bright, 98-0398 at 10-16, 776 So.2d at 1143-44.
Conversely, in the instant case, defendant, in his second statement, admitted to planning a robbery with Gabriel Logan. He further admitted telling the victim, "Give me the money," before he shot him. The fact that defendant did not share in the fruits of the robbery is immaterial for purposes of LSA-R.S. 14:30(A)(1); defendant's actions demonstrated the completed offense of attempted armed robbery. LSA-R.S. 14:64; LSA-R.S. 14:27. In fact, although the taking of the victim's money occurred after the defendant shot and killed the victim and fled the scene, the evidence supported a finding of armed robbery as well. Because the homicide and *851 subsequent taking of the victim's property formed an integral part of the same transaction, the killing of the victim occurred during an armed robbery and constituted first degree murder. See State v. Nelson, 459 So.2d 510, 518 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 322 (1985) ("The murder facilitated the robbery. It unquestionably occurred while the defendant was engaged in armed robbery."); State v. Anderson, 97-1301, p. 3, (La.2/6/98), 707 So.2d 1223, 1224 ("Acting in concert, each man then became responsible not only for his own acts, but for the acts of the other.").
The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." State v. Mussall, 523 So.2d 1305, 1310 (La.1988). Here, viewed in the light most favorable to the prosecution, a reasonable jury could have determined that the State's evidence supported all of the elements to prove that defendant committed first degree murder during the perpetration of an attempted armed robbery or armed robbery.
Defendant's claims of insufficiency fail on the merits, and these assignments of error are without merit.

4. Executing mentally retarded persons constitutes cruel and unusual punishment, in violation of the Eighth Amendment.
Defendant's case is governed by the recent decision from the United States Supreme Court, Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. In Atkins, the Court held that executing mentally retarded offenders is excessive under the Eighth Amendment, which "`places a substantive restriction on the State's power to take the life.'" Atkins, 536 U.S. at ___, 122 S.Ct. at 2252 (quoting Ford v. Wainwright, 477 U.S. 399, 405, 106 S.Ct. 2595, 2599, 91 L.Ed.2d 335 (1986) (Eighth Amendment precludes execution of the insane.)).[20] This court is bound by the decision of the United States Supreme Court in Atkins.
Atkins is based on the "evolving standards of decency" that have occurred since the 13-year-old decision in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), allowed execution of a mentally retarded defendant. The Court noted that during the interim between Atkins and Penry, the practice of executing mentally retarded persons had become truly unusual. Thus, the Court found a national consensus had developed against such executions. Construing the Eighth Amendment in light of this documented evolution, the Court concluded execution of the mentally retarded was excessive and thus constitutionally barred. The Court reasoned that the mentally retarded, while not exempt from criminal sanctions, have diminished personal culpability. Further, mentally retarded defendants as a whole face a special risk of wrongful execution. Thus, the 13-year-old Penry precedent of allowing execution of a mentally retarded defendant is now a relic of the past.[21]
In Atkins, while extending Eighth Amendment protection to the mentally retarded, the United States Supreme Court *852 left the imposition of the new rule to the states:
As was our approach in Ford v. Wainwright, with regard to insanity, "we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).
Atkins, 536 U.S. at ___, 122 S.Ct. at 2250.
Although the United States Supreme Court left the task of developing appropriate ways to enforce the constitutional restriction against execution of the mentally retarded to the states, the Court provided guidance in some areas. The Court adopted a "clinical definition" of mental retardation which requires not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction which became manifest before the age of 18. Id., 536 U.S. at ___, 122 S.Ct. at 2250. This definition is based on the definition developed by the American Association of Mental Retardation (AAMR)[22] and is the definition utilized by the federal government[23] and in some form by most of the states that have statutes prohibiting the execution of the mentally retarded.[24] It also closely follows the definition *853 in AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed.2000).[25]
The Supreme Court acknowledged "there is serious disagreement about ... determining which offenders are in fact retarded." Atkins, 536 U.S. at ___, 122 S.Ct. at 2250. Realistically, the Court noted that not all persons who claim to be mentally retarded will be so impaired as to fall within the group entitled to the Atkins prohibition against the death penalty. Noting that state statutory definitions of mental retardation are not identical, but are generally in conformity with the definitions cited in Atkins, the Court, nonetheless, left to the states the task of developing appropriate ways to determine which offenders will be spared the death penalty because of mental retardation.
While Louisiana is not one of the states that has directly addressed, either legislatively or jurisprudentially, the issue of mental retardation in the criminal context, the revised statutes contain a definition of mental retardation for the purpose of determining those individuals who qualify for mental retardation and developmental disabilities services.
Louisiana Revised Statutes 28:381(28) provides:
"Mental retardation" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior, and manifested during the developmental period.
"General intellectual functioning" is shown by "the results obtained by assessment with one or more of the individually administered general intelligence tests developed for that purpose." LSA-R.S. 28:381(18). To be "significantly subaverage" in general intellectual functioning, one must be "more than two standard deviations below the mean for the test of intellectual functioning." LSA-R.S. 28:381(42).[26]
*854 Louisiana Revised Statutes 28:381(12) provides:
"Developmental disability" means a severe chronic disability of a person:
(a) That is attributable to:
(i) Mental retardation
. . . .
(b) That is manifested before the person reaches age 22.
(c) That is likely to continue indefinitely.
(d) That results in substantial functional limitations in three or more of the following areas of major life activity:
(i) Self-care.
(ii) Understanding and use of language.
(iii) Learning.
(iv) Mobility.
(v) Self-direction.
(vi) Capacity for independent living.
Thus, it appears there is a general consensus as to the definition and diagnosis of mental retardation. However, because at the present time Louisiana is without a legislative mandate to utilize any specific definition with respect to Atkins claims, this court must decide which of these definitions should be used. Apparently, all would be acceptable under the Supreme Court's mandate in Atkins.
An apparent universal agreement is reflected in Louisiana's definitions in LSA-R.S. 28:381, that a diagnosis of mental retardation has three distinct components: (1) subaverage intelligence, as measured by objective standardized IQ tests; (2) significant impairment in several areas of adaptive skills; and (3) manifestations of this neuro-psychological disorder in the developmental stage, i.e., by the age of 22 years.[27]
Given this particular defendant's age he will not be 22 until December 2003it would be inappropriate, based on the present record, for this court to determine whether or not the defendant is indeed mentally retarded. Instead, a remand of the case for a full evidentiary hearing to determine whether or not the defendant is mentally retarded using Louisiana's existing statutory definition is warranted. An evidentiary hearing will allow the introduction *855 of evidence to determine whether the defendant is mentally retarded based on the criteria established in LSA-R.S. 28:381.
In the instant case, it is undisputed that the issue of whether defendant is mentally retarded, and thus protected from the ultimate punishment of death based on the decision of the United States Supreme Court in Atkins, has not been presented to the fact finder for determination. Such a determination is within the milieu of the trial court, not this reviewing court. Thus, we defer review of the penalty phase of defendant's trial pursuant to LSA-C.Cr.P. art. 905.9 and La. Sup.Ct. R. 28, and remand the case to the trial court for a hearing and determination of whether defendant, Corey Williams, is mentally retarded.
We note that although defendant's IQ is 68,[28] the defense's own expert testified unequivocally, at both the guilt and penalty phases of trial, that defendant is not mentally retarded. His assessment is based on the fact that defendant is not deficient in adaptive functioning, but copes well with common life demands and the standards of personal independence. Dr. Vigen concluded that, while defendant has a low IQ,[29] he is street smart, and thus, not mentally retarded.
Atkins also subscribed to the diagnostic criteria that the onset of mental retardation must occur before the age of 18 years. Atkins, 536 U.S. at ___ n. 3, 122 S.Ct at 2245 n. 3. In the instant case, defendant had at least four psychiatric hospitalizations beginning from approximately age 13. However, defendant was voluntarily admitted to these institutions at times close to his various juvenile court date appearances.
Thus, while the defense argues that these hospitalization records support defendant's history of mental illness, Dr. Vigen interpreted the Highland Hills hospital records as indicating that the hospital had determined defendant was not mentally retarded.[30] He then surmised, "I don't know that he's ever been diagnosed as mentally retarded."
In response to this court's invitation to file a supplemental brief specifically addressing the impact (or lack thereof) of Atkins on this case, appellate counsel launched a twofold attack on the defense expert. First, counsel filed a motion to enlarge the present appellate record with a copy of a June 1996 psychological assessment *856 of the defendant after his commitment to the Jetson Correctional Center for Youth in Baker, Louisiana. According to counsel, the report shows that: 1) defendant's group-screening intelligence test results were "suggestive" of mental retardation; 2) an individual intellectual assessment by officials at Jetson confirmed a full scale IQ score of 65; 3) defendant's diagnosis was mild mental retardation; and 4) defendant stated he had received head injuries when struck by an 18 wheeler truck. Also according to counsel, although the State purportedly filed the defendant's juvenile records, including his records from Jetson, into the appellate record, the critical Jetson diagnostic report was not included. It surfaced only after counsel obtained the case file from one of defendant's trial attorneys and found the report in a set of the defendant's Department of Corrections (DOC) files.[31]
Appellate counsel argues that, at the least, the defendant is entitled to a remand of this case to the district court for purposes of exploring this official diagnostic impression by an arm of the DOC that may exempt the defendant from capital punishment. We agree. If the document is authentic, it shows that Dr. Vigen based his opinion on less than a complete history of defendant's diagnoses and treatment. Full disclosure of that history would have required Dr. Vigen to resolve the discrepancy between his conclusion that the Highland Hills hospital records excluded a diagnosis of mental retardation in 1995, and the Jetson evaluation of mental retardation less than a year later, a process that might have led to a change in his own evaluation.
Second, appellate counsel confronts Dr. Vigen's opinion that defendant's adaptive skills excluded a diagnosis of mental retardation (despite an IQ in the mild mental retardation range) because he was "street smart." On the basis of the available materials filed into the record, counsel points out that Dr. Vigen did not perform any formal tests to determine the defendant's adaptive skills, a glaring omission in view of the test results from Fairfield Hospital indicating that the defendant's GAF (Global Assessment of Functioning Scale) was 35, on a scale of 100, at which 90 represents good functioning in all areas.
To the extent that appellate counsel has uncovered the Jetson report indicating that the DOC classified the defendant as mentally retarded over a year before the present crime and well before he reached the age of 18, counsel has illustrated the record is incomplete and, thus, this court cannot make a determination whether defendant is mentally retarded based on this record. Therefore, this case is remanded to the trial court for an evidentiary hearing to resolve the discrepancies in the defendant's records relating to a diagnosis of mental retardation.
While this court will not consider matters not in the record and we pass no judgment on the validity of these records, we note these records are generated by the State, but most significantly, Atkins changed what would be considered relevant. Prior to the trial, mental retardation was merely a factor in mitigation. *857 Post Atkins, mental retardation is a complete prohibition against imposition of the death penalty according to the United States Supreme Court.
We hasten to point out that not everyone faced with a death penalty sentence will automatically be entitled to a post-Atkins hearing. It will be an individual defendant's burden to provide objective factors that will put at issue the fact of mental retardation. See text accompanying footnote 33, infra. A defendant's entitlement to a post-Atkins hearing will be made on a case-by-case basis.
Our review of the record convinces us this case warrants a hearing. Corey Williams is an African-American male born on December 13, 1981. The defendant's mother admitted to drinking alcohol during her pregnancy with defendant.
According to school records, as early as age nine, defendant was in special classes at Oak Park Elementary School. He was placed in "special ed" in 1988 (seventh grade), classified as learning disabled/speech impaired. The defendant advanced through the public school system without making much measurable progress toward learning. He attended J.S. Clark Middle School and was enrolled at Booker T. Washington High School at the time of the instant offense. His grades in school were mostly D's and F's.
On May 24, 1995, at age 13, defendant was admitted to Fairfield Hospital following a suicide attempt in which he tried to jump off a bridge. In approximately September 1995, defendant was placed in Highland Hills Hospital (a facility that specializes in treating adolescents with behavioral and emotional problems). While there, the defendant displayed immature behavior such as thumb sucking and "nocturnal enuresis" (bed-wetting). The defendant had a prescription history of anti-depressant medications, including Prozac and Zoloft.
In sum, this defendant is an individual who: 1) was 16 years of age[32] at the time of the murder, still within the "developmental stage" by any definition of that term; 2) will not be 22 years of age until 2003, still within the development stage by Louisiana's statutory definition; 3) has an IQ within the range used in the diagnosis of mental retardation; 4) suffered from lead poisoning as an infant and had numerous mental health commitments prior to the age of 15; 5) was enrolled in "special ed" classes; and 6) has not had the issue of mental retardation put before the fact finder in light of the Atkins restriction on the death penalty. Thus, this court concludes the defendant is entitled to an evidentiary hearing which will give him an opportunity to prove he is mentally retarded pursuant to the definitions of LSA-R.S. 28:381, and, under Atkins, not subject to the death penalty. Defendant's case will be remanded to the trial court for an evidentiary hearing on the issue of mental retardation only.
*858 By virtue of this remand, this court is not in any manner indicating an opinion on whether or not defendant is mentally retarded. Rather, we are remanding for a determination of that issue. Although defendant's expert opined he is not mentally retarded, this factual/legal determination, guided by experts capable of diagnosing mental retardation, must be made at the trial court level, based on the factors listed above. At the hearing, the trial court must specifically determine whether or not the defendant is mentally retarded, but should not necessarily consider the full measure of mitigating circumstances considered during the penalty phase of the trial. While some factors of defendant's personal history may be relevant to both mitigation and the determination of mental retardation, mitigating factors not relevant to the determination of whether or not the defendant is mentally retarded should not be considered.

5. Guidelines for evidentiary hearing to determine mental retardation.
The specifics of remanding a case on an Atkins claim is res nova in Louisiana and there is little jurisprudence to lend guidance.
Accordingly, we remand this case to the trial court for an evidentiary hearing on the issue of mental retardation with guidance as to how to conduct such a hearing. In the interim between this opinion and legislative action on the subject, this court instructs the trial courts to treat the issue procedurally as they would treat pre-trial competency hearings, for which statutory criteria already exist in Louisiana. See LSA-C.Cr.P. art. 641 et seq. This procedure should be appropriately modified when necessary to address the particulars of assessing mental retardation.[33] For example, LSA-C.Cr.P. art. 644 governs the appointment of a sanity commission and the examination of the defendant. In pertinent part, LSA-C.Cr.P. art. 644(A) provides:
Within seven days after a mental examination is ordered, the court shall appoint a sanity commission to examine and report upon the mental condition of the defendant. The sanity commission shall consist of at least two and not more than three physicians who are licensed to practice medicine in Louisiana.
*859 We note that instead of physicians, experts with the appropriate expertise to diagnose mental retardation shall be utilized. In cases in which there must be a remand based on Atkins, this procedure will allow for court-appointed experts to examine the defendant and determine if indeed he meets the criteria for mental retardation established in LSA-R.S. 23:381. In addition, LSA-C.Cr.P. art. 646 also gives the State and the defendant the right to an independent mental examination by an expert of their choice, a procedure which would also be beneficial in these matters. However, the trial court must not rely so extensively upon this expert testimony as to commit the ultimate decision of mental retardation to the experts. See State v. Snyder, 98-1078, p. 26 (La.4/14/99), 750 So.2d 832, 852, citing State v. Bennett, 345 So.2d 1129, 1137 (La. 1977).
The code also provides for a contradictory hearing, with LSA-C.Cr.P. art. 647 stating:
The issue of the defendant's mental capacity to proceed [or in this case, the issue of whether or not the defendant is mentally retarded under applicable standards] shall be determined by the court in a contradictory hearing. The report of the sanity commission is admissible in evidence at the hearing, and members of the sanity commission may be called as witnesses by the court, the defense, or the district attorney. Regardless of who calls them as witnesses, the members of the commission are subject to cross-examination by the defense, by the district attorney, and by the court. Other evidence pertaining to the defendant's mental capacity to proceed may be introduced at the hearing by the defense and by the district attorney.
Precedent exists for using a sanity commission to grapple with the question of mental retardation. This court's seminal decision in State v. Bennett, 345 So.2d 1129 (La.1977) (on reh'g), involved the question of whether the defendant's mental retardation rendered him incompetent to stand trial. This court ultimately remanded for a second sanity hearing, to be held following a complete reexamination of the defendant; we concluded the trial court had "failed to apply the appropriate standard in assessing defendant's capacity to proceed and that the sketchy reports of the examining physicians did not justify a decision as to defendant's sanity at that time." Bennett, 345 So.2d at 1136. Bennett thereby acknowledged the appropriateness of using a sanity commission convened under LSA-C.Cr.P. art. 644 to address, albeit in the context of the Due Process Clause and not under the Eighth Amendment, the question of a defendant's mental retardation.
The evidentiary standard for the defendant to meet in proving that he is mentally retarded poses an important question. Our survey of states that possess statutes barring execution of the mentally retarded reveals some states require the defendant prove his status by a preponderance of the evidence, while other states require clear and convincing evidence. For purposes of the Due Process Clause and the question of a defendant's competency to stand trial, the Supreme Court has made clear that states may require only the lesser standard of a preponderance of the evidence. Cooper v. Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996); see State v. Frank, 96-1136 (La.10/4/96), 679 So.2d 1365, 1366 ("Cooper has returned Louisiana to this Court's jurisprudential rule that a criminal defendant need prove his incapacity to proceed only by a clear *860 preponderance of the evidence."[34]). In the absence of any guidance from the Supreme Court, this court adopts the preponderance of evidence standard in the Atkins context as well. Differing standards of proof tend to allocate the risk of erroneous fact finding to either the State or the defendant. See Cooper, 517 U.S. at 362-363, 116 S.Ct. at 1381 ("The more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision."). (Internal quotation marks and citation omitted.) Requiring a defendant to prove by clear and convincing evidence he is exempt from capital punishment by reason of mental retardation would significantly increase the risk of an erroneous determination that he is not mentally retarded. Clearly, in the Atkins context, the State may bear the consequences of an erroneous determination that the defendant is mentally retarded (life imprisonment at hard labor) far more readily than the defendant of an erroneous determination that he is not mentally retarded.
As to the forum in which the Atkins issue is litigated, it is significant that the majority of states which have provided a statutory exemption from capital punishment for the mentally retarded have made the finding of mental retardation a matter for the trial judge as opposed to the jury.[35] The better practice under Atkins is reflected by the procedure of such states as Indiana and Missouri, where the court makes a pre-trial determination of whether the defendant is mentally retarded and thereby spares both the State and the defendant the onerous burden of a futile bifurcated capital sentencing procedure. In light of the fact that this defendant's trial has already taken place, the allocation to the court of the determination of the issue of his mental retardation avoids the onerous burden of a second penalty phase.[36]

*861 CONCLUSION
As to the procedures to be used for post-Atkins hearings, we instruct the trial courts as follows: 1) to order a pre-trial evidentiary hearing on the issue of mental retardation when the court has "reasonable ground" to believe a defendant is mentally retarded, LSA-C.Cr.P. art. 643; 2) to hold the hearing before a judge, not a jury; and 3) to require the defendant to prove by a preponderance of the evidence that he meets the criteria established in Louisiana's statutory definition of mental retardation, LSA-28:381.
Having reviewed the guilt portion of this defendant's trial and having found no reversible error, we affirm the defendant's conviction. We pretermit review of the penalty phase of defendant's trial and remand the case for a post-Atkins hearing on the sole issue of whether the defendant is mentally retarded.
CONVICTION AFFIRMED. CASE REMANDED FOR EVIDENTIARY HEARING.
VICTORY, J., concurs in part and dissents in part with reasons.
VICTORY, J., concurring in part and dissenting in part.
I concur in the majority's determination to remand this case to the trial court for an evidentiary hearing on the issue of mental retardation. We are bound by the decision of the United States Supreme Court in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, and thus a remand is proper.
However, I disagree with one of the guidelines set out by the majority for trial courts in death penalty cases until the Legislature acts. As stated in Atkins and noted by the majority, mental retardation involves diminished culpability. Under our law, culpability issues, including insanity at the time of the offense, are decided by a jury, not the trial judge. I believe the same should be true for mental retardation. In any event, as soon as it can act, the Legislature will decide how our courts will handle this issue. Further, the Legislature will have to decide whether the defendant's burden of proving mental retardation is by a preponderance of the evidence, or by clear and convincing evidence *862 as now required by several other states.
NOTES
[1] See also State v. Dunn, 01-1635, (La. 11/01/02), 831 So.2d 862. For other cases addressing post-Atkins proceedings see Bell v. Cockrell, 310 F.3d 330 (5th Cir.2002); Murphy v. Oklahoma, 54 P.3d 556 (Okl.Cr. 9/4/02); People v. Pulliam, ___ Ill.2d ___, ___ Ill.Dec. ___, ___ N.E.2d ___, 2002 WL 31341298 (Ill.10/18/02).
[2] As did the United States Supreme Court, we use the term "mental retardation" at the present time. We note there is current dissatisfaction with the term "mental retardation," but there has been no consensus on a substitute term. There have been changes of the term in the past, and considering that people with mental retardation and others in the field are struggling to identify a new term for the disability, there is likely to be a change in the future. See AMERICAN ASSOCIATION ON MENTAL RETARDATION, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (10th ed.2002). "The manual retains the term mental retardation. Many individuals with this disability urge elimination of the term because it is stigmatizing and is frequently mistakenly used as a global summary about complex human beings. After considerable deliberation by a number of groups, there is no consensus of an acceptable alternative term that means the same thing. Thus, at this time, we were unable to eliminate the term, despite its acknowledged shortcomings." Id. at xii.
[3] If the trial court determines defendant is mentally retarded and the State chooses to appeal that determination, this court remains the proper forum for that appeal. See LSA-C.Cr.P. art. 913; State v. Langley, 95-1489, p. 2 n. 1 (La.4/3/02), 813 So.2d 356, 359 n. 1.
[4] The original indictment was returned against "Cory D. Williams" for the murder of "Jarvis Griffin." The amended indictment charged "Corey Williams" with killing "Jarvis Griffin."
[5] Gabriel Logan was tried separately, and that jury returned the responsive verdict of guilty of second degree murder.
[6] The court minutes reflect that the jury deliberated 1 hour and 15 minutes following the guilt phase.
[7] The assignments of error not addressed in this opinion are addressed in an unpublished Appendix.
[8] The bullet that was removed from Griffin's chest during autopsy had entered his left arm and passed through his chest, perforating both lungs and penetrating the tip of one of the chambers on the left side of his heart. Another bullet was found in the door panel of the car.
[9] Gabriel Logan and Moore gave Nathan Logan $10.00, which he later turned over to the lead homicide investigator, Detective Ronnie Gryder. In his statement, defendant denied receiving any of the robbery proceeds. Neither Nathan Logan nor Moore was charged with any offense in connection with the shooting.
[10] Anthony disappeared after the shooting, and despite the State's efforts to have him arrested on a material witness bond, he was never located to testify at trial.
[11] Defense counsel argued a second new ground for suppressing the statement at the hearing, namely, that the police coerced defendant by telling him if he confessed he would get only juvenile life instead of the death penalty.
[12] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[13] Section G of LSA-C.Cr.P. art. 703 provides:

When a ruling on a motion to suppress a confession or statement is adverse to the defendant, the state shall be required, prior to presenting the confession or statement to the jury, to introduce evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.
A ruling made adversely to the defendant prior to trial upon a motion to suppress a confession or statement does not prevent the defendant from introducing evidence during the trial concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.
[14] The "substantial impairment" standard applies to reverse-Witherspoon challenges. In Morgan v. Illinois, 504 U.S. 719, 738-39, 112 S.Ct. 2222, 2234-35, 119 L.Ed.2d 492 (1992), the Supreme Court held that venire members who would automatically vote for the death penalty must be excluded for cause. The Court reasoned that any prospective juror automatically voting for death would fail to consider the evidence of aggravating and mitigating circumstances, thus violating the impartiality requirement of the Due Process Clause. Id., 504 U.S. at 729, 112 S.Ct. at 2229. The Court in Morgan adopted the Witt standard for determining if a pro-death juror should be excused for cause.
[15] We limit our discussion in this opinion to defendant's challenge to the person who eventually became the jury foreperson. The remainder of defendant's arguments concerning the other three prospective jurors he challenged for cause, which challenges the trial court denied, plus the other arguments made concerning the voir dire portion of the trial are addressed in the unpublished Appendix.
[16] During voir dire, the parties used a chart that listed all of the mitigating circumstances under LSA-C.Cr.P. art. 905.5.
[17] During the final round of the selection process, defense counsel exhausted his 12 peremptory challenges, including some backstrikes. Ms. Fertitta was the very next prospective juror tendered to the State, and the State accepted her as the twelfth juror.
[18] "Attempt" is defined in LSA-R.S. 14:27 as follows:

A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
"Armed robbery" is defined in LSA-R.S. 14:64 as follows:
A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
[19] Thus, under LSA-R.S. 14:24, the State had to prove that "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime are principals."
[20] The issue of whether execution of a mentally retarded person is barred by the Eighth Amendment and by the Louisiana Constitution has been raised by several defendants. See State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, and cases cited therein. Those cases, however, were decided prior to the United States Supreme Court's pronouncement of a bar to such application of the death penalty in Atkins.
[21] The mandate of Atkins that the State may not execute a mentally retarded person is retroactive to any case, at any stage of the proceedings, including the instant case, in which the defendant is facing the prospect of capital punishment. See State v. Sanders, 523 So.2d 209 (La.1988), a case in which this court held new constitutional rules for the conduct of criminal trials will be given limited retroactive effect to all cases pending on direct review or still subject to direct review, unless the new rule is designed to overcome an aspect of the proceedings that impaired its truth-finding function; in the latter cases, the new rule will be given full retroactive effect. See also Penry, 492 U.S. at 330, 109 S.Ct. at 2953, ("[I]f we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures followed, such a rule would fall under the first exception to the general rule of non-retroactivity and would be applicable to defendants on collateral review.").
[22] "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).

Atkins, 536 U.S. at ___, 122 S.Ct. at 2245 n. 3.
Although the Court used the AAMR's definition in MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS (9th ed.1992), we note that MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS (10th ed.2002), was published shortly before the release of Atkins. Thus, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS (10th ed.2002) presumably was not available to the Court during briefing and argument stages of the litigation. The AAMR's 2002 definition is: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical skills. This disability originates before age 18." MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (10th ed.2002).
The definition of mental retardation has been in a state of flux for over 65 years, evidenced by the definitions dating from Tredgold (1908, 1937) and Doll (1941, 1947) to the current AAMR 10th Edition definition. MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 19 (10th ed.2002).
[23] 18 U.S.C.A. § 3596(c).
[24] Ariz.Rev.Stat. Set. 13-3982; Ark.Code Ann. Sect. 5-4-618 (1993); Colo.Rev.Stat. Sec. 16-9-401-403; Conn. Gen.Stat. § 53a-46a; Fla. Stat. Ann. § 921.137; Ga.Code. Ann. § 17-7-131(I); Ind.Code § 35-36-9-1; Kan. Stat. Ann. § 21-4623; Ky.Rev.Stat. § 532.120-140; Md. Cod. Ann. art. 27 § 412; Mo.Rev.Stat. 565.030; N.M. State. Ann. § 31-20A-2.1; Neb.Rev.Stat. § 28-105.1; N.Y.Crim. Proc. Law § 400.27; 2001 N.C. Sess. Laws 346; S.D. Codified Laws § 23A-27A-26.1; Tenn.Code Ann. § 39-13-203; Wash. Rev.Code. § 10.95.030.
[25] "The essential feature of Mental Retardation is significantly sub-average general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. The onset must occur before age 18 years. Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000).

"Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id., at 42-43.
Atkins, 536 U.S. at ___, 122 S.Ct. at 2245 n. 3.
[26] The Wechsler scales and the Stanford-Binet are two test instruments frequently used to assess intelligence, commonly referred to as IQ. MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 59 (10th ed.2002). While both utilize a mean IQ score of 100, the Wechsler scale uses a standard deviation of 15 and the Stanford-Binet a standard deviation of 16 in arriving at scores that indicate less than (or greater than) average intelligence. Id. at 61-62. Thus, a person reported as being two standard deviations below the mean, as stated in LSA-R.S. 28:381(42), quoted above, would have an IQ of 70 using the Wechsler scale and an IQ of 68 using the Stanford-Binet scale.

Regardless of the standard deviation used, the assessment of intellectual functioning through the primary reliance on IQ tests must be tempered with attention to possible errors in measurement. Errors of measurement as well as true changes in performance outcome should be considered in interpreting IQ test results. The concept of standard error of measurement (SEM) is an aid. One SEM is plus or minus a specified number of IQ points. Thus, an IQ of 70 could range from 66 to 74 assuming an SEM of 4. Id. at 57.
In the 2002 AAMR system, the "intellectual functioning" criterion for diagnosis of mental retardation is approximately two standard deviations below the mean, considering the SEM for the specific IQ assessment instruments used and the strengths and limitations of the various instruments. Id. at 58. We note that the relevant Louisiana provision refers to more than two standard deviations below the mean. See LSA-R.S. 28:381(42). See also, LSA-R.S. 14:42, Aggravated rape, which provides in paragraphs A(6) and C(2) that the rape is deemed to be without lawful consent when the victim is prevented from resisting by a "mental infirmity," that is, the victim has an IQ of 70 or less.
It is important to note that subaverage general intellectual functioning as measured by an IQ test is not the sole criteria for determining whether one is mentally retarded. As reflected in LSA-R.S. 28:381(28) and all other definitions of mental retardation, significant subaverage general intellectual functioning must exist concurrently with deficits in adaptive behavior and must manifest during the developmental stage. A low IQ may reflect one who is limited intellectually, but who nevertheless is not mentally retarded.
[27] We note other definitions use the age of 18; however, the Louisiana statute gives the age of 22 as the termination of the developmental stage. Until the legislature acts, we feel constrained to follow this legislative directive.
[28] Dr. Vigen tested defendant's IQ on June 20, 2000, and on that date, the resulting score was a full scale IQ of 68. Defendant was age 19 at the time of this test. In 1994, when defendant was in the sixth grade and age 13, he had a full scale IQ of 69.
[29] Dr. Vigen testified that the margin of error or the SEM in the IQ test administered is five points, giving defendant's test a confidence interval between 65-73. But see, footnote 26, supra. Although Louisiana's definition of significantly subaverage intellectual functioning does not specifically use the word "approximately," because of the SEM, any IQ test score has a margin of error and is only a factor in assessing mental retardation.
[30] See LSA-Ch.C. art. 895(A), which provides in pertinent part:

In cases in which a child has been adjudicated a delinquent, the court may commit him to a public or private mental institution... if the court finds, based on psychological or psychiatric evaluation, that the child has a mental disorder, other than retardation, which has a substantial adverse effect on his ability to function and requires care and treatment in an institution. (Emphasis supplied.)
We note that while this article requires a condition other than mental retardation for commitment, the article does not exclude commitment of a person who is mentally retarded and also suffers other mental disorders.
[31] Because trial of this matter was conducted prior to Atkins, mental retardation as a factor exempting defendant from the death penalty was not an issue. Therefore, counsel's trial strategy may have been to shift the focus away from any diagnosis of mental retardation. As mentioned previously, the mere term "mental retardation" connotes negative images in some people. Many individuals with this disability complain the term is stigmatizing and is erroneously used as a global summary about complex human beings. See MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS xii (10th ed.2002).
[32] Defendant reached the age of 16 less than a month prior to the murder for which he was charged and convicted. If he had been 15 years of age on the date of the murder, he would not have been subject to the death penalty. In Atkins, 536 U.S. 304, 122 S.Ct. at 2249 n. 18, 153 L.Ed.2d 335, Justice Stevens, writing for the majority, pointed out the lack of national consensus prohibiting the execution of juvenile offenders over the age of 15, an issue seemingly resolved in Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). But see, In re Stanford, ___ U.S. ___, 123 S.Ct. 472, 154 L.Ed.2d 364 (2002), on petition for writ of habeas corpus by the same defendant. From the denial of the writ, Justices Stevens, Souter, Ginsberg, and Breyer dissented, arguing that the question of whether the Eighth Amendment precludes execution of juvenile offenders deserves another look by the Court.
[33] As this court has said regarding the appointment of a sanity commission, the granting of an evidentiary hearing on the issue of mental retardation is "not a perfunctory matter or a ministerial duty of the trial court, and is not guaranteed to every [defendant] in every [capital] case." State v. Sepulvado, 93-2692, pp. 4-5 (La.4/8/96), 672 So.2d 158, 163, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). (Emphasis supplied.) There is no automatic right to a hearing on the issue of mental retardation, whether the hearing is sought pre-trial, while the case is on appeal, or as post-conviction relief.

For determining when an evidentiary hearing is necessary to decide whether a defendant faced with a capital sentence is mentally retarded, the courts can use the standard provided by statute for determining when a pre-trial competency hearing is necessary. See LSA-C.Cr.P. art. 643 ("The court shall order a mental examination of the defendant when it has reasonable ground to doubt the defendant's mental capacity to proceed."). See also, LSA-C.Cr.P. art. 643, Official Revision Cmt. (a) ("It is not enough that the defense has filed a motion urging the defense [of mental incapacity to proceed], but there must be sufficient evidence to raise a reasonable doubt as to such capacity.") Of course, the "reasonable doubt" mentioned in the Comment is not a reference to proof beyond a reasonable doubt in the guilt phase of the trial. Instead, Article 643 establishes a standard that a defendant must meet by coming forward with some evidence to put his mental condition at issue. For a discussion of LSA-C.Cr.P.art. 641 et seq. and the jurisprudence that applies these procedures, see State ex rel. Seals v. State, 00-2738 (La.10/25/02), 831 So.2d 828.
[34] Interjecting the word "clear" is unnecessary and misleading because it gives the impression some hybrid standard of proof exists. The standard of proof is by a preponderance of the evidence.
[35] The recent decision in Ring v. Arizona, 536 U.S. ___, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), is distinguishable. In Ring, Arizona's capital sentencing scheme, in which the jury found all of the facts necessary to convict the defendant of first degree murder, but the trial judge found the aggravated circumstance necessary to punish the defendant with death, as opposed to life imprisonment, was challenged. The Court held the scheme violated the Sixth (and by implication the Eighth) Amendment. Ring, 536 U.S. at ___, 122 S.Ct. at 2432 ("Capital defendants, no less than non-capital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."). However, Ring addressed the question of what limits, if any, the Sixth Amendment imposed on the otherwise plenary discretion of state legislatures to define crimes and prescribe punishments. The decision grapples with the question of the extent to which a state may designate a finding of fact as a sentencing consideration for the court as opposed to an essential element of the offense for a jury to determine beyond a reasonable doubt. The Supreme Court would unquestionably look askance at a suggestion that in Atkins it had acted as a super legislature imposing on all of the states with capital punishment the requirement that they prove as an aggravating circumstance that the defendant has normal intelligence and adaptive function. Atkins explicitly addressed mental retardation as an exemption from capital punishment, not as a fact the absence of which operates "as the functional equivalent of an element of a greater offense." Ring, 536 U.S. at ___, 122 S.Ct. at 2443. (Internal quotation marks and citation omitted.)
[36] In Assignment of Error No. 14, defendant alleges that an incomplete transcript prevents him from perfecting his right to an appeal. Most of the omissions he cites are addressed in the Appendix to this opinion.

However, appellate counsel complains that missing from the appellate record are defendant's records from his incarcerations at Louisiana Technical Institute (LTI), formerly known as Tallulah Correctional Center for Youth (TCCY), and Caddo Correctional Center (CCC). Before the penalty phase of the trial began, the State and the defense entered into a stipulation regarding these records. From the transcript of the discussion between the judge and counsel concerning the use of these records, it is apparent the intent was that the entire set of records be introduced into the record in globo. The TCCY and the CCC records, along with defendant's records from various psychiatric institutions, were referred to in the penalty phase of the case during the testimony of defense expert, Dr. Mark Vigen upon direct examination and cross examination. Although the medical and educational records have been included in the appellate record before us and are available for review, the records from CCC and TCCY were excluded. To the extent that the correctional records are unavailable for appellate counsel to perfect defendant's appeal, he validly demonstrates an error of omission.
Considering this court's decision to remand the case for an evidentiary hearing on the issue of whether defendant is mentally retarded, missing records of defendant's institutional history can be located and, if relevant to the issue of mental retardation, not merely a mitigating factor, considered on remand. If either the TCCY or the CCC records or both are not admitted at the evidentiary hearing, appellate counsel can take measures to assure they are included in the record of whatever appeal occurs subsequent to the evidentiary hearing.