**UNITED STATES of America**

v.

**Bryan NELSON.**

**Criminal Action No. 02–304.**

United States District Court,
E.D. Louisiana.

Feb. 22, 2006.

Gregory M. Kennedy, U.S. Attorney's Office, New Orleans, LA, for Plaintiff.

John Wilson Reed, Glass & Reed, New Orleans, LA, Carol Anne Kolinchak, New Orleans, LA, for Defendant.

### *ORDER AND REASONS*

BARBIER, District Judge.

This matter came before the Court for an evidentiary hearing on February 2, 3, and 6, 2006, held to determine whether defendant Bryan Nelson is mentally retarded as contemplated by *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and thus ineligible for the death penalty pursuant to 18 U.S.C. § 3596(c). As set forth more fully below, the Court finds that Bryan Nelson is men-

tally retarded, and therefore not subject to the death penalty.

## BACKGROUND

The Government has filed a third superseding indictment against the defendant, charging him, *inter alia*, with causing the death of Christopher Briede, by murder as defined in 18 U.S.C. § 1111, in the course of a crime of violence (carjacking) in violation of Title 18 U.S.C. § 924(c) and (j). Title 18 U.S.C. § 924(j) provides that "[a] person who, in the course of a violation of subsection (c), causes the·death of a person through the use of a firearm, shall ... if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life...." The Government has filed a Notice of Intent to Seek the Death Penalty as to Defendant Bryan Nelson. Rec. Doc. 138. Defendant subsequently moved for a pre-trial determination of whether defendant was mentally retarded.

## DISCUSSION

### I. A Pretrial Atkins Determination by the Court is Appropriate

The Federal Death Penalty Act provides that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c). However, the statute provides no guidance on how it should be implemented. Likewise, the Supreme Court in *Atkins* provided no implementation guidelines, but rather "left to the states the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences," when it held that the execution of mentally retarded persons violates the prohibition against cruel and unusual punishment contained in the 8th Amendment. *Id.* at 317, 122 S.Ct. 2242 (citations omitted). As a result, addressing the *Atkins* issue as presented by the defendant re-

quires the Court to make several threshold determinations: who the fact-finder should be; when to address the matter; what definition of mental retardation to apply; who has the burden of proof on this issue; and what standard of proof is applicable. The Court previously determined that a pre-trial determination by the Court is appropriate, but expands on that finding herein. *See* Rec. Doc. 252.

### A. The Court is an Appropriate Fact–Finder

In *United States v. Webster,* 162 F.3d 308 (5th Cir.1998), the Fifth Circuit rejected the defendant's argument that due process required that a jury make the factual determination under 18 U.S.C. § 3596(c) as to whether the defendant was mentally retarded and therefore death ineligible. 162 F.3d 308, 352 (5th Cir.1998). However, this decision (*Webster I*) predated the Supreme Court's holdings in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that a jury, rather than a judge, must find beyond a reasonable doubt any fact that exposes a criminal defendant to a penalty greater than the statutory maximum, and in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), that capital murder defendants are entitled to a jury determination of any fact that increases their maximum punishments. In essence, *Apprendi* and *Ring* dictate that any fact which operates as " 'the functional equivalent of an element of a greater offense' " must be found by a jury. *Ring,* 536 U.S. at 609, 122 S.Ct. 2428 (quoting *Apprendi,* 530 U.S. at 494, 120 S.Ct. 2348).

Subsequent to these Supreme Court decisions, the Fifth Circuit (in the context of a § 2254 petitioner's request to file a successive habeas petition) explicitly held that "neither *Ring* and *Apprendi* nor *Atkins* render the absence of mental retardation

the functional equivalent of an element of capital murder...." *In re Johnson*, 334 F.3d 403, 405 (5th Cir.2003). Indeed, "the absence of mental retardation is not an element of the sentence any more than sanity is an element of an offense." *Id.* Relying on these precedents, when the Fifth Circuit revisited the issue of Webster's entitlement to a jury on the retardation finding post-*Apprendi* and *Ring*, it acknowledged that the absence of mental retardation is not required to be determined by a jury. 392 F.3d 787, 792 (5th Cir.2004) (*Webster* II). The Fifth Circuit is not alone in reaching this conclusion. *See, e.g., State v. Williams*, 831 So.2d 835, 860 (La.2002); *Russell v. State*, 849 So.2d 95, 146–48 (Miss.2003); *People v. Smith*, 193 Misc.2d 462, 751 N.Y.S.2d 356, 357 (N.Y.Sup.Ct.2002). As the Louisiana Supreme Court has observed, *Atkins* established mental retardation as an exemption from capital punishment, not a fact whose absence results in an enhancement. *Williams*, 831 So.2d at 860.

Moreover, most state legislatures have also concluded that resolution of the issue by the court is appropriate. For instance, 17 of the 18 states which had procedures in place to address mental retardation prior to *Atkins* either require or authorize the trial court to determine mental retarda-

tion.[1] Of the eight states which have enacted legislation specifying procedures for determining mental retardation in response to *Atkins*, all but one authorize or require the issue to be committed to the trial court.[2] Accordingly, in conformity with Fifth Circuit precedent and other persuasive authorities, the Court determined that it was the appropriate factfinder on the question of Bryan Nelson's possible mental retardation.

### B. Pre–Trial Consideration is Appropriate

The Court has also previously found that overriding practical considerations dictate that the *Atkins* issue be resolved up front. If prior to trial a defendant is found to be mentally retarded and therefore ineligible for the death penalty, significant resources are saved in terms of trial preparation, motion practice, voir dire, trial time, mitigation research, etc. To defer the *Atkins* /mental retardation issue until after such a resource-intensive trial would be wasteful in a situation like the instant case, in which the defendant, from the moment he first raised the *Atkins* issue, appeared able to make a colorable *Atkins* claim.[3]

In reaching that conclusion, the Court also noted that the majority of state legislatures who have considered the question

1. *See* Ariz.Rev.Stat. Ann. § 13–703.02; Colo. Rev.Stat. Ann. §§ 18–1.3–1102; Ind.Code Ann. §§ 35–36–9–5; Ky.Rev.Stat. Ann. §§ 532.135; S.D. Codified Laws §§ 23A–27A; Tenn.Code Ann. § 39–13–203; Ark.Code Ann. § 5–4–618; Mo. Ann. Stat. § 565.030; N.C. Gen.Stat. § 15A–2005; N.Y.Crim. Proc. Law § 400.27; Kan. Stat. Ann. § 21–4623; Neb. Rev.Stat. § 28–105.01; N.M. Stat. Ann. § 31–20A–2.1; Conn. Gen.Stat. § 53a–46a (on motion of defendant with consent of state); Md. Code Ann., Crim. Law §§ 2–202,–303; Fla. Stat. Ann. § 921.137; Wash. Rev.Code Ann. § 10.95.030.

2. *See, e.g.,* Idaho Code § 19–2515A; Utah Code Ann. §§ 77–15a–101 to –106, 77–18a–1;

Nev.Rev.Stat. 174, 175.554, 177.015, 177.055, 200.030; La.Code Crim. Proc. Ann. art. 905.5.1 (by consent of the parties); Del.Code Ann. tit. 11, § 4209; Ill. Comp. Stat 5/114–115; Cal.Penal Code § 1376 (upon defendant's request).

3. In support its original motion for a pretrial *Atkins* determination, defense counsel provided an evaluation by and the verified statement of a licensed psychologist attesting that defendant qualifies as mentally retarded under the AAMR and DSM–IV–TR standards. Defendant's Memo in Support, Rec. Doc. 227, unnumbered exhibit.

have adopted an approach allowing for pre-trial resolution.[4] Courts confronting the issue have also acknowledged the wisdom of adjudicating the issue pre-trial. For instance, the Louisiana Supreme Court observed that "[t]he better practice under *Atkins* is ... a pre-trial determination of whether the defendant is mentally retarded and thereby spares both the state and the defendant the onerous burden of a futile bifurcated capital sentencing procedure." *State v. Williams,* 831 So.2d 835, 860 (La.2002).

In addition, the Court notes that the issue of mental retardation is the type of threshold issue (somewhat analogous to competency), that is generally committed to the court for pretrial resolution.

### C. Burden of Proof/Standard of Proof

Both the Government and the defense agree that the defendant bears the burden of establishing by a preponderance of the evidence that he is mentally retarded.

## II. The Definition of Mental Retardation

In this case, the Government has suggested that the Court should apply the definition for mental retardation promulgated by the American Psychiatric Association ("APA") and contained in the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition Text Revision ("DSM–IV–TR") instead of that promulgated by the American Association for the Mentally Retarded ("AAMR"). *See,* Rec. Doc. 326. The *Atkins* decision incorporated both definitions for mental retardation.

*Atkins,* 536 U.S. at 309 n. 3, 122 S.Ct. 2242. The current version of each follows.

The AAMR 10th Edition defines mental retardation as "significant limitations both in intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills with the disability originating before age 18."

The DSM–IV–TR defines mental retardation as:

A. Significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test (for infants, a clinical judgment of significantly subaverage intellectual functioning).

B. Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.

C. The onset is before age 18 years.

*Atkins'* incorporation of both definitions suggests that the Supreme Court did not consider them conflicting. Instead, the Supreme Court prohibited the execution of any defendant who "fall[s] within the range of mentally retarded offenders about whom there is a national consensus." 536 U.S. at 317, 122 S.Ct. 2242.

To the undersigned, it seems that both the AAMR and DSM–IV–TR definitions

---

4. California (at defendant's option)(Cal. Penal Code § 1376); Delaware (Del.Code Ann. tit. 11 § 4209); Idaho (Idaho Code § 19–2515A(2)); Illinois (Illinois Code 114–15, 122–2.2); Louisiana (by consent of the parties)(La.C.Cr.P. § 905.5.1); Nevada (Nev.Rev. Stat. § 174.098); New York (N.Y.Crim. Law § 400.27(1)); and Utah (Utah Code Ann.

§ 77–15A0104); Ariz.Rev.Stat. Ann. § 13–703.02; Colo.Rev.Stat. Ann. §§ 18–1.3–1102; Ind.Code Ann. §§ 35–36–9–5; Ky.Rev.Stat. Ann. §§ 532.135; S.D. Codified Laws §§ 23A–27A; Ark.Code Ann. § 5–4–618; Mo. Ann. Stat. § 565.030; N.C. Gen.Stat. § 15A–2005.

reflect a national consensus. Thus, to the extent there is a conflict, should a defendant meet *either* definition, his execution is prohibited. However, the undersigned emphasizes that the definitions do not appear to conflict. The main distinguishing feature is the inclusion of a potential cut-off number-an IQ of approximately 70 or below—in the DSM–IV–TR definition, that is absent in the AAMR definition, which establishes a criterion of an IQ "two standard deviations below the mean." Upon inquiry, however, it turns out that as a rule, IQ tests have a mean of 100 and a standard deviation of 15 points; thus, two standard deviations below the mean is equivalent to an IQ of approximately 70 or below.

With respect to the adaptive functioning prongs of the two definitions, while the AAMR references three types of adaptive skills—conceptual, social, and practical adaptive skills, and the DSM–IV–TR references ten, the ten skills contained in the DSM–IV–TR represent a more specific breakdown, or subset, of the broader categories contained in the AAMR. All of the expert testimony on this point reflected that the definitions are consistent, and in fact, the current DSM–IV–TR definition is identical to the 1992 AAMR definition. Swanson, Tr. 206; Woods, Tr. 20. The current AAMR was modified in 2002, and the new DSM–IV–TR definition is likely to be identical to 2002 AAMR. *Id.*

Accordingly, the Court considers the two definitions to be essentially congruent, and, as set forth more fully below, finds that defendant meets both.

### III. *Evidence Adduced at the Hearing*

#### A. *Witnesses*

At trial, the Court heard the testimony of three expert witnesses: Dr. Victoria Swanson, Dr. George Woods, and Dr. Matthew Thompson. Dr. Victoria Swanson, an expert called by the defendant, is a licensed psychologist specializing in the treatment of individuals with mental retardation and developmental disabilities. Her masters and doctoral research focused on mentally retarded individuals, as has all of her research throughout her career. She has evaluated thousands of individuals to determine whether they are mentally retarded. She has been specifically trained and has administered the Wechsler test, the intelligence test utilized in this case, on hundreds of occasions. She has also been trained on and administered the Vineland adaptive skills test on thousands of occasions. She has been trained and has administered the newer ABAS–II adaptive behavior assessment as well. The Court, without objection, found Dr. Swanson to be qualified as an expert in psychology with a particular expertise in diagnosing and treating mental retardation.

The defense also called Dr. George Woods. Dr. Woods is a physician board-certified by the American Board of Psychiatry and Neurology who specializes in psychiatry and neuropsychiatry. His forensic practice involves evaluations of whether individuals are mentally retarded, which he has done approximately 20–25 times. He was accepted as an expert in the field of psychiatry without objection by the Government.

Finally, the Court heard the testimony of Dr. Matthew Thompson, the Government's expert, who was qualified without objection as an expert in neuropsychology. His practice at Children's Hospital deals most frequently with traumatic brain injury. His graduate research focused on Alzheimer's disease and he has never published on the issue of mental retardation.

The reports of all of these experts, as well as that of Dr. Drew Gouvier, a neu-

ropsychologist, who did not testify, were admitted at the hearing.

Also testifying at the hearing were Ms. Schajuan Jones, the defendant's second grade teacher, who actually taught him for two years since she held him back; Ms. Ozie Bailey, the defendant's aunt, with whom he lived in Virginia from the ages of 11 to 14; Ms. Adrian Gilmore, a family friend who was involved in caring for the defendant prior to his moving to Virginia; and Marilyn Moore, a family friend who had contact with the defendant following his return from Virginia at age 14. Mrs. Amy Briede and Mr. David Thornton gave fact testimony regarding crimes in which the defendant allegedly participated and in which they were victimized.

### B. Documentary Evidence

Of critical relevance to the issues before the Court are the results of the four Wechsler IQ tests administered to the defendant, two Wechsler Intelligence Scale for Children ("WISC–III") tests, given when Nelson was 11 and 14, and two Wechsler Adult Intelligence Scale ("WAIS–III") tests, administered in 2004 and 2005 in connection with this case. The scores of all four tests are summarized in the table below:

| IQ TEST | VIQ [5] | PIQ/NVIQ [6] | FSIQ [7] | 95% Confidence Interval |
|---|---|---|---|---|
| WISC–III(1994) | 62 | 73 | 65 | 58–72 |
| WISC–III(1997) | 72 | 84 | 76 | 69–83 |
| WAIS–III(2004) | 69 | 72 | 67 | 64–72 |
| WAIS–III(2005) | 73 | 78 | 74 | 70–79 |

The test results are expressed in terms of a "95% confidence interval." A confidence interval is the probability that the test score obtained in a given test reflects the test-taker's true score. It is the range in which the true score will be found 95% of the time. Thus, his 2004 score of 67, with a confidence interval of 64–72, means that there is a 95% chance that Nelson's actual IQ is between 64 and 72. Exh. 1, at p. 5; Swanson, Tr. 154.

The full test results, and protocols where extant, were admitted at the hearing. Two videotapes of the testing administered by Dr. Thompson were admitted and viewed by the Court in their entirety following the hearing. Also admitted were the results of a variety of standardized tests administered to the defendant over the course of his life. They are summarized in Exhibit 36. Finally, the Court considered the statements of Bryan Nelson given to the New Orleans Police Department.

### IV. The Evidence Demonstrates Nelson's Significantly Subaverage Intellectual Functioning

Drs. Swanson, Woods, and Gouvier all concluded that Nelson met the first prong of the mental retardation definition, in that he exhibited significantly subaverage intellectual functioning, reflected by IQ scores of approximately 70 or below (or greater than two standard deviations below the mean). Dr. Thompson concluded that he did not meet this first prong, even though the result of the IQ test administered by

5. Verbal IQ

6. Performance IQ/Nonverbal IQ

7. Full–Scale IQ

him reflected a confidence interval that includes the mentally retarded range.

The undersigned finds that the preponderance of the evidence clearly demonstrates that the first prong is met. All of the experts who testified acknowledged the presence of a very consistent pattern running throughout Nelson's testing: very low verbal and audiological abilities coupled with a relative strength in visual processing or performance IQ. This profile was observed anecdotally by his first teacher, Miss Schajuan Jones, when Nelson was eight years old; reflected in his first battery of testing in Virginia at the age of 11; and maintained throughout his most recent testing by the Government's expert, Dr. Thompson. The striking consistency throughout Nelson's testing is corroborated by all of the other evidence in this case.

For instance, Dr. Swanson testified that contributing to her diagnosis was the fact of fetal alcohol exposure during the time Bryan Nelson's mother was pregnant with him. Fetal alcohol exposure children have a higher instance of mental retardation and learning disabilities. Swanson, Tr. 144. Moreover, because the brain starts growing *in utero* and continues until the age of seven, the extreme deprivation experienced by Nelson, which Dr. Swanson described as "one of the worst deprived environments that there could possibly be," as well as the physical abuse suffered by Nelson, also supported her diagnosis. Tr. 145–46.

Nelson's early schooling experiences also suggest the presence of mental retardation. In very credible and impressive testimony, Nelson's second-grade teacher, Miss Jones, whom Nelson encountered on enrolling for school for the first time at almost eight years old, recognized that he lacked pre-primer skills and engaged in extensive modifications to improve his academic and intellectual functioning. The modifications were not successful and she retained him for a year, after which he received a social promotion. Dr. Swanson opined that with a normal individual, the modifications engaged in by Miss Jones would have allowed him to catch up, at least to a preschool or kindergarten level. But in Nelson's case, that did not occur. Swanson, Tr. 157. Indeed, it never occurred: in 2005, at the age of 21, Nelson was reading at a fourth-grade level. Exh. 36.

Dr. Swanson also addressed the import of a 1994 Woodcock Johnson battery conducted following Nelson's arrival in Virginia. Dr. Swanson described the test as a robust test with good statistics, nearly tantamount to an IQ test. Swanson, Tr. 155. That test had a mean of 100 and standard deviation of 15; Nelson received a broad cognitive standard score of 63, well below two standard deviations below the mean. It also provided the first empirical evidence of the pattern present in Nelson throughout his life—extreme verbal deficits coupled with a relative strength in visual processing/mathematics. Exh. 1, at p. 4. The same pattern holds in his first recorded IQ test, the WISC–III administered in 1994, in which Nelson received a verbal IQ score of 62, a performance IQ of 73, and a full-scale IQ of 65.

In 1997, Nelson's IQ scores appear to spike from a full-scale IQ of 65 to 76. Because this result was somewhat elevated compared to the 1994 test and the 2004 test which she administered and in which she had confidence, Dr. Swanson conducted a deeper inquiry to determine the cause for the increase. What she learned was that two factors likely contributed to the higher score. First, she noted that the test was modified by being broken into two separate sessions. Normally, the test is administered in one sitting, and taking it

in two phases might have elevated Nelson's score. But more significant was the fact that a review of all testing records showed that the Woodcock Johnson was administered to Nelson three days before the start of the WISC–III. The Woodcock–Johnson and the WISC–III contain similarities that could produce a practice effect,[8] and Dr. Swanson opined that this may well have produced the elevated score. Swanson, Tr. 176–77. The conclusion that the increase was due to a practice effect and the two-phase testing modification rather than an actual increase in IQ is borne out by the fact that Nelson's academic scores did not experience a concomitant rise during that period. Tr. 178. Dr. Woods testified that with the ostensible improvement reflected in the 1997 test scores, one would expect a corresponding increase in his academic performance. Woods, Tr. 27. Instead, the academic results indicate that Nelson was falling further behind, leading Dr. Woods also to conclude that the 1997 IQ test was an "outlier." Woods, Tr. 27. At any rate, even with the possible practice effect and elevated scores, the 95% confidence interval indicated a range of 69–83, which did not necessarily take Nelson out of the range for the mental retardation diagnosis. Tr. 184.

Seven years later, in 2004, Dr. Swanson administered the WAIS–III. Nelson scored a verbal IQ of 69, a performance IQ of 72, and a full-scale IQ of 67. Thus, the now-well established pattern repeated itself. Swanson, Tr. 184. These scores clearly evidence an IQ in the mentally retarded range.

Nelson's most recent IQ test was conducted by the Government's expert, Dr. Thompson. On that test, a WAIS–III taken less than a year after Dr. Swanson

administered a WAIS–III, Nelson scored a verbal IQ of 73, a performance IQ of 78 and a full-scale IQ of 74. The 95% confidence interval of 70–79 places Nelson within the mentally retarded range. Nevertheless, Dr. Thompson opined that Nelson demonstrated a poor effort during testing, and that his IQ might actually be above 74. He stated that his conclusion concerning poor effort was based upon tests he administered designed to assess malingering, and that Nelson's highest IQ score—76, received at age 14, was probably the best indicator of Bryan Nelson's intellectual capacity. Dr. Thompson attributed Nelson's low score of 65 in 1994 to be a result of his limited life exposure up to the point when he was brought to Virginia. However, like Drs. Swanson and Woods, the Court concludes that these scores are not artificially low due to poor effort, but rather are artificially elevated as the result of a practice effect.

In this case, while Dr. Thompson could have chosen to administer a test with which Nelson was entirely unfamiliar, the Stanford–Binet, instead he chose to administer the exact test that Nelson had taken only 51 weeks before. The manual for the WAIS–III tests states that practice effect is not minimized until the passage of one to two years. Swanson, Tr. 197.

It is clear from the videotapes of Dr. Thompson's test administration that Nelson remembered the test, and there was absolutely no novelty for Nelson associated with certain sub-tests. For instance, Nelson, at different junctures, asked for blocks and cards, clearly anticipating the sub-tests. At one point, before instructions were given, Nelson looked at the test materials and then asked Dr. Thompson if he supposed to "do as many as I can in

---

8. A "practice effect" occurs when a test subject receives a higher score than he otherwise would as a result of recently taking a similar test.

time, right?" Thompson, Tr. 136. This is significant because part of what is being tested in the WAIS–III is how the subject receives, perceives, and responds to instructions concerning a novel task, thus challenging the subject's ability to listen to the tester, process information, and perform accordingly. Swanson, Tr. 198. The length of time to process instructions is also being tested. Swanson, Tr. 199. Thus, the fact that Nelson clearly remembered certain sub-tests would have contributed to elevated scores, by perhaps six points. Swanson, Tr. 201. For this reason, Dr. Thompson's credibility is somewhat undermined because he states in his report only that practice effect is not commonly found in mentally retarded individuals, and in his testimony, unequivocally denied that there were indications of a practice effect, in spite of the fact that Nelson unquestionably remembered parts of the test. Thompson, Tr. 34.

In addition, the Court notes that much like the 1997 WISC–III that was administered in two phases allowing for recovery time that could contribute to an elevated score, the WAIS–III administered by Dr. Thompson was also broken up. Swanson, Tr. 196.

Dr. Woods' testimony provided further corroborating evidence for the mental retardation diagnosis. Dr. Woods requested neuropsychological testing which reflected an anatomical basis for Nelson's intellectual shortcomings. Neuropsychological testing is considered the "gold standard" for these types of assessments because it is virtually impossible to malinger. Woods, Tr. 31.

In Nelson's case, the Test of Adult Language ("TOAL")(one of the neuropsychological tests) revealed that Nelson has a pervasive impairment characteristic of a lifelong mixed receptive-expressive language disorder. Dr. Woods identified a problem with left temporal lobe functioning which was consistent with Nelson's speech pathology from the time he was 11 years old. Woods, Tr. 40. The same temporal lobe impairment was reflected by another neuropsychological test, the RBANS. Tr. 41. A sensory examination reflected frontal temporal lobe problems; a trail-making test reflected frontal lobe problems. Tr. 49. In keeping with all of the other testing conducted over the course of Nelson's life, a limited relative strength was identified by Tactical Performance Test. However, Dr. Woods emphasized that the relative strengths were limited: Nelson's best score on any section of the RBANS was 1%, in immediate memory and visuoconstruction. Thus, the presence of a limited relative strength is not inconsistent with a diagnosis of mental retardation, which is not necessarily global.

Like Dr. Swanson, Dr. Woods observed (as is obvious from all of the evidence) that Nelson's test results demonstrate an internal consistency between achievement tests, academic functioning, and neuropsychological testing, from a time when he had no incentive to skew tests (at the age of 11). There is no test where performance scores are lower than verbal scores. Woods, Tr. 54. Everything in Nelson's academic and testing records reinforces the problems with temporal and frontal lobe functioning and relative strength in the parietal lobe identified by Woods and Gouvier. Notably, even for Nelson's highest IQ test score, the 1997 test reflecting an IQ of 76, the confidence interval indicates that there was a 95% chance that at the time of that test Nelson's actual IQ fell between 69 and 83.

The Court finds that the great weight of the credible expert testimony dictates this result, and on this record, the Court finds that the defendant has demonstrated by a preponderance of the evidence that he is

significantly subaverage in his intellectual functioning.

### V. Nelson's Adaptive Functioning Skills are Impaired

In addition to a low IQ, to meet the criteria for a mental retardation diagnosis an individual must have concurrent deficits or impairments in present adaptive functioning. The DSM–IV–TR requires the deficits be present in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.

In this case, the defendant's adaptive functions were assessed using several instruments: the Vineland Adaptive Behavior Scales–Interview Edition ("Vineland") administered by Dr. Swanson, and the Independent Living Scales ("ILS") and the Adaptive Behavior Assessment System—Second Edition ("ABAS–II") administered by Dr. Thompson. On all three of these instruments, Nelson was found to have adaptive functioning deficits that would support a diagnosis of mental retardation.

The Vineland comprises a series of questions addressed to the true care providers of the person whose functioning is at issue. It is designed to provide a measure of habitual or typical behavior by interviewing a person familiar with the individual's ability to adapt in his or her environment. Exh. 1, at p. 6. In Nelson's case, Dr. Swanson identified the following care providers: Adrian Gilmore, who was familiar with Nelson prior to his move to Virginia; Ozie Bailey, who cared for him at her home in Virginia from the age of 11 to 14; and Marilyn Moore, the individual closest to a care provider following Nelson's return from Virginia. Swanson, Tr. 208.

The results of all three administrations of the Vineland fell in the mental retarda-tion range (severe to moderate deficit range). Exh. 1, at p. 6. The results obtained from Adrian Gilmore indicate that at age 10, Nelson met all ten of the DSM–IV–TR criteria. Swanson, Tr. 220. He fell into the profound deficit range due to his problems with dressing himself, taking care of himself, and domestic skills, and the severe range in communication. Tr. 217.

The results obtained from Ms. Ozie Bailey reflect that after three years of residing in her care, Nelson achieved his highest level of functioning. Tr. 217. Despite this progress, however, his adaptive skills still fell within the mentally retarded range. Tr. 218.

As reflected in the Vineland administration to Marilyn Moore, upon Nelson's return to New Orleans, Nelson quickly regressed back to his prior, lower adaptive function level without a lot of structure, supervision, and prompting. Tr. 223. He lost the self-care skills he had achieved and was noted to be dirty again, and lacking in social skills and self-direction.

Notably, while no earlier adaptive assessments had been performed, as Dr. Swanson testified, all of the historical records in this case indicate long-standing deficits in adaptive behaviors. Swanson, Tr. 212. Dr. Woods, too, noted internal consistencies in Nelson's adaptive functioning. Woods, Tr. 22. For example, Ms. Bailey, Miss Jones, and Ms. Gilmore all testified to the defendant's inability to bathe and use soap—adaptive skills which a normal child would have learned by modeling. Woods, Tr. 23.

School records and interviews corroborate that Nelson consistently fell below 70, greater than 2 standard deviations below the mean, in adaptive behavior at every period of his life. Swanson, Tr. 225. For instance, with respect to communication,

Nelson has historically scored below 70 on his speech evaluations; likewise, Ms. Jones testified to audiological processing issues present during her contact with him at the age of eight. Nelson has demonstrated problems with social-interpersonal skills, such as difficulty writing a check or finding a utility company. As for self-direction, it has apparently been a longstanding challenge: Miss Jones testified to the need for one-on-one attention and supervision to keep Nelson on task; later, in Virginia, Ms. Bailey was called to school on a daily basis because Nelson could not direct himself and needed others to keep him in line. Swanson, Tr. 211. The record is replete with evidence of deficits in Nelson's functional academic skills. *See, e.g.,* Exh. 36. The Court also notes that the testimony at the hearing, particularly the very impressive and credible testimony of Miss Schajuan Jones and Ms. Ozie Bailey, reinforced the Court's confidence in the test results obtained by Dr. Swanson.

Accordingly, the Court agrees with Dr. Swanson's assessment that Nelson meets the second criterion of both DSM–IV–TR and AAMR.

With respect to Dr. Thompson's testimony that the results he obtained on the ILS and ABAS–II were the product of possible malingering, and thus do not provide a basis for concluding the second prong of the mental retardation criteria has been met, the Court has determined his testimony on this point is not deserving of much weight. Dr. Thompson utilized tests which depend on self-reporting, which both he and Dr. Swanson acknowledged is often inaccurate. While Dr. Thompson concluded any inaccuracy would be in the direction of Nelson minimizing his actual adaptive functioning level, and thus Nelson's low score could be attributed to malingering, as Dr. Swanson testified, it is equally plausible that he might exaggerate

in the other direction and that such exaggeration would not be uncommon in a mentally retarded person. Indeed, at the hearing, Dr. Thompson acknowledged that Nelson overstated his abilities. Thompson, Tr. 71. Further, Dr. Thompson conceded that when he administered the ABAS–II to Nelson and Ms. Bailey, it was possibly his first or second time administering that test, which was a new test (although apparently is similar to the ABAS–I that he had previously administered). In contrast, Dr. Swanson administered the Vineland, considered the most reliable adaptive capacity assessment tool, which she had previously administered on thousands of occasions. Swanson, Tr. 215. The Court finds that Dr. Swanson's results were obtained by a better tester using a better test and adopts her findings over Dr. Thompson's. The Court also reiterates that the conformity of the results obtained by Dr. Swanson (and for that matter by Dr. Thompson) with the other records in this case all point to a finding that Nelson expresses the adaptive functioning deficits necessary to support a diagnosis of mental retardation.

Finally, the Court notes that the Government also introduced the testimony of Kevin Thornton and Amy Briede, concerning the details of Bryan Nelson's alleged behavior during the crimes in which they were victimized. The testimony was introduced to illustrate that Bryan Nelson allegedly had a leadership role in both crimes, thus suggesting a level of adaptive functioning high enough to preclude a finding of mental retardation.

The Court makes two observations with respect to this testimony. First, some of the details of the testimony actually suggest that Nelson was not functioning at a very high level—for instance, when he and his co-defendants left Mr. Thornton unattended permitting his escape, and when he

left the Briede home, unarmed, with Mrs. Briede, and encountered difficulty in using the ATM machine without being coached or walked through the process by Mrs. Briede. Second, as Dr. Woods testified, Nelson's behavior in these isolated incidents has limited relevance to the mental retardation diagnosis because it is isolated, in contrast to the recurring patterns which emerge from all of the records in this case and which indicate a low level of adaptive functioning. Accordingly, neither Mr. Thornton's nor Mrs. Briede's testimony suggests to the Court that Nelson does not satisfy the adaptive functioning deficit requirement.

## VI. *Malingering Not a Factor in this Case*

The Court must also address the question whether Nelson was malingering during the post-indictment IQ tests administered by Swanson and Thompson in 2004 and 2005, an issue raised by Dr. Thompson. Clearly, at that point Nelson had an incentive to demonstrate that he was mentally retarded. Dr. Thompson testified and reported that he administered response validity tests for effort, or malingering, and that they indicated that Nelson was exerting poor effort at certain times.

Nevertheless, the Court finds again that the weight of the credible expert testimony suggests otherwise. For one thing, the timing of the main response validity test which Dr. Thompson relies on, the Test of Memory and Malingering ("TOMM"), is suspect. The TOMM was administered on May 5, 2005, roughly a month after the WAIS–III, which had been given on April 7, 2005. As conceded by Dr. Thompson in his report, the TOMM only provides information on how Nelson performed on the TOMM. Thompson, Tr. 123. And while there may be an argument that it is has some utility in discerning effort levels on

tests taken near to it in time, the Court is skeptical of its usefulness in discerning a test subject's effort level a month previous to its administration.

Dr. Swanson considered Nelson's effort very good, and also noted that tests for malingering are often of limited use for lower IQ individuals, because they have never been tested on a normative sample of mentally retarded individuals. Thus, it was her opinion that a determination of malingering must be based on clinical judgment. Dr. Woods, too, emphasized that Dr. Thompson's symptom validity tests were not normed, and that clinical judgment was required to determine malingering. Woods, Tr. 27–31. He also suggested looking to test results produced at a point where the defendant did not have an incentive to skew them—all of which are consistent with Nelson's post-indictment results. Moreover, the Court witnessed with its own eyes the video of Dr. Thompson's IQ test in which Nelson asked for the blocks to complete one of the sub-tests. This request in itself is inconsistent with low effort. Swanson, Tr. 203. The Court also observes that Dr. Thompson's own testimony on this issue is somewhat contradictory—at one point, Dr. Thompson testified that Nelson put forth better effort for him than he did for Dr. Swanson. Thompson, Tr. 22.

However, the most compelling argument against the possibility of malingering in this case is the overwhelming consistency among all of intelligence testing, academic testing, neuropsychological testing, and anecdotal recollections, including those dating from the time when Nelson had no incentive to malinger. Every IQ test Nelson has had, including Dr. Thompson's, reflect the same pattern—the same cognitive strengths and weaknesses, falling within similar confidence intervals. Swanson, Tr. 192, 204. Indeed, the striking

consistency of Nelson's results over time led Dr. Woods to conclude that if Nelson was malingering, he started malingering at the age of 11. Woods, Tr. 56. Even that would not explain the consistency in the results of the neuropsychological tests, which are almost impossible to malinger, and which pointed to an anatomical basis for Nelson's problems. The neuropsychological tests, superior to ones administered by Dr. Thompson, did not reflect poor effort. Exh. 5, at p. 2. It is simply impossible for the Court to conclude that Nelson has been malingering since age 11 and has been able to manufacture the identical testing pattern for all those years.

Finally, the Court notes that in general, it considers Dr. Thompson's report and testimony to be deserving of less weight than that accorded to the other experts who testified at the hearing. Unlike Dr. Swanson, Dr. Thompson does not have any special expertise in mental retardation. Moreover, his credibility is called into question by the "cherry-picking" he engaged in while drafting his report. For instance, on the question of adaptive skills, Dr. Thompson selected and emphasized an isolated comment by one of Nelson's teachers in Virginia that Nelson had "emerged as a leader." However, a review of the entirety of the Chester County school records, and later the New Orleans school records, reveals overwhelming evidence that Nelson had difficulty resisting peer pressure and paints a picture of a follower more than a leader. *See* Exh. 50, at pp. 106, 112, 140, 152, 156, 173, 194, 197. Setting aside the question of whether Nelson was a leader or follower, the Court is troubled by Dr. Thompson's decision to valorize one passing comment in his report that is so at odds with the totality of the record. This decision suggests a bias on Dr. Thompson's part in favor of a finding of no mental retardation which undermines his credibility relative to the other experts in this case.

### VII. *Conclusion*

None of the parties hereto contests that whatever limitations Nelson has, their onset was prior to the age of 18. And, based on all of the evidence, the Court finds that Nelson possesses significant limitations both in intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills, and meets both the AAMR and DSM–IV–TR criteria for a diagnosis of mental retardation. Accordingly, the Court finds that the defendant Bryan Nelson is mentally retarded, and pursuant to 18 U.S.C. § 3596(c) he is ineligible for the death penalty.

**IT IS SO ORDERED.**