PER CURIAM:
Writ denied. In 1991, Allen Robertson, Jr. was charged by grand jury indictment with two counts of first degree murder, arising from the deaths of Morris and Kazuko Prestenback. After a trial in 1991, Robertson was found guilty as charged and sentenced to death on both counts. Following the first trial, this Court vacated the convictions and sentences, having found that the trial court erroneously denied a defense challenge for cause to a prospective juror. State v. Robertson , 92-2660 (La. 1/14/94), 630 So.2d 1278. After the second trial in 1995, an East Baton Rouge Parish jury found Robertson guilty as charged on both counts and unanimously agreed to impose a sentence of death based upon the aggravating circumstances that the murder occurred during the commission of an aggravated burglary, that the murder occurred during the commission of an armed robbery, and that he knowingly created a risk of death to more than one person.[1] This Court affirmed the convictions and sentences. State v. Robertson , 97-0177 (La. 3/4/98), 712 So.2d 8.
The evidence presented at trial showed that Morris and Kazuko Prestenback, an elderly couple, lived several houses down from the residence of Robertson's mother on Dalton Street in Baton Rouge. On the evening of January 1, 1991, Robertson slipped into the Prestenback home through an unlocked screen door in search of money to buy cocaine to feed his long-term addiction to the drug. He first grabbed the Prestenback's television and sold it on the street for $20. He then returned to the residence, slipping through the same *270 screen door, paused to grab a 13-inch knife in the kitchen, and then entered the bedroom in which Morris Prestenback was sleeping. Mr. Prestenback evidently awoke as Robertson prowled around the bedroom. A struggle ensued which led to a gruesome murder, in which Robertson stabbed Mr. Prestenback (who was in his 70s) multiple times in the head, face, and chest, and Mr. Prestenback suffered numerous fractures of the facial and nasal bones. Some of the eight stab wounds to the chest hit vital organs and major blood vessels, severed eight of the victim's ribs, and were almost 7" deep. Mr. Prestenback bled to death.
As Robertson struggled with Morris Prestenback, Kazuko Prestenback awoke in her separate bedroom, came upon the bloody scene in her husband's bedroom, and attempted to flee. Robertson attacked her in the hallway, inflicting several deep wounds in her back with the kitchen knife. Mrs. Prestenback retreated into her bedroom and curled into a fetal position on the bed as Robertson continued to stab her in the chest, carving through several of her ribs and spattering her blood on the ceiling and walls of the room. Robertson remained in the house for several minutes to make sure the Prestenbacks were dead, then took a watch, cash, and car keys and left.
He climbed into the Prestenback's Oldsmobile, backed out of the driveway, uprooting and driving over a chain-link fence and gate, which were barring the way, and then sped down Dalton Street, eluding an off-duty police officer who gave chase briefly after observing the Oldsmobile run a stop sign. Robertson quickly abandoned the car and escaped on foot, making his way to the home of his girlfriend, Michelle Alexander.
Robertson immediately confessed to her and to members of his family that he had killed the Prestenbacks. Following his arrest on January 3, 1991, at Alexander's home, Robertson also gave a series of taped statements to police in which he confessed to the murders.
After his convictions and sentences became final, Robertson filed a shell application for post-conviction relief, which the district court summarily denied before setting an execution date. This Court vacated the ruling and execution date and remanded with an order to appoint post-conviction counsel. State ex rel. Robertson v. State , 00-1059 (La. 4/26/00), 760 So.2d 1163. Following the resolution of funding issues, this court again remanded for post-conviction proceedings. State ex rel. Robertson v. Cain , 03-2747 (La. 5/7/04), 872 So.2d 1073.
In July 2007, post-conviction counsel filed an amended application for post-conviction relief and a motion for an evidentiary hearing.[2] In 2008, the district court granted some state objections and summarily denied Robertson's remaining claims on the merits, including his claim that he is intellectually disabled and thus, pursuant to Atkins v. Virginia , 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), exempt from capital punishment. Robertson then filed another writ application in this Court claiming, inter alia , that the district court erred in failing to conduct an evidentiary hearing to determine whether he is intellectually disabled. In *271 response, this Court granted writs in part and remanded for an evidentiary hearing on the limited issue of intellectual disability. Robertson v. Cain , 08-1116 (La. 9/4/09), 17 So.3d 960.
In accordance with this Court's order, the district court conducted multi-day intellectual disability hearings (the " Atkins hearing") on November 13-14, 2013, April 21-23, 2014, and April 4-6, 2016, after which the district court rejected Robertson's claim, taking into consideration his school records (which indicated no prior diagnosis of intellectual disability), his I.Q. scores, and his ability to adapt to life.
We have reviewed Robertson's claim and find no reason to disturb the district court's ruling.[3] In Atkins v. Virginia , 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the Supreme Court held that the execution of mentally retarded persons (now referred to as intellectually disabled) constitutes excessive punishment, and therefore violates the Eighth Amendment. As implemented in Louisiana, intellectual disability is a three-part condition shown by establishing: (1) sub-average intelligence and (2) significant impairment in several areas of adaptive skills that (3) manifested during the developmental stage. State v. Williams , 01-1650, pp. 22-24 (La. 11/1/02), 831 So.2d 835, 853-54.[4]
At the Atkins hearing, the experts were split on whether Robertson met the criteria for intellectual disability. Defense expert, Dr. Mark Cunningham,[5] and court-appointed expert, Dr. Jill Hayes,[6] concluded that Robertson met the criteria. However, the second court-appointed expert, Dr. Curtis Vincent,[7] and the state's expert witness, Dr. Donald Hoppe,[8] opined that Robertson did not.
*272 As an initial matter, all four experts agreed that Robertson had never been diagnosed with intellectual disability before the Atkins inquiry, and this Court has previously viewed "made-for-litigation diagnoses" with suspicion. Brumfield v. Cain , 854 F.Supp.2d 366, 404 (M.D. La. 2012) (citing State v. Dunn , 01-1635, p. 27 (La. 5/11/10), 41 So.3d 454, 472 ); see also Ex parte Cathey , 451 S.W.3d 1, 20 (Tex. Crim. App. 2014) ("It is difficult to credit that a developmental intellectual disability can lie dormant and undiscovered for [37] years and then spring full-grown, like Minerva from Zeus's forehead, only when that person would be exempted from the death penalty if found so disabled."); Leigh D. Hagan & Thomas J. Guilmette, The Death Penalty and Intellectual Disability , 31 FALL CRIM. JUST. 21, 25 (2017) ("Although DSM-5 and the AAIDD reference assessment of adaptive deficits, no evaluation strategy should apply the blinders of single-hypothesis confirmation, selective attention to the evidence, a priori conclusions, or result-driven advocacy.").
As to the first criterion, Robertson's IQ has been tested four times over the course of his life.[9] Notably, one IQ test was administered to Robertson before the age of 18, and his score of 76 is above the generally-accepted range to meet the criteria for intellectual disability.[10] Court-appointed *273 expert, Dr. Vincent, testified that this score should be weighed heavily, and opined that, from this single score, Robertson did not meet the criteria for intellectual disability. However, Robertson's three subsequent scores (74, 70, and 73) and their confidence intervals (range calculated from the standard error of measurement)[11] include scores of 70 or below, and given these borderline IQ scores, Robertson's diagnosis is heavily dependent on his adaptive functioning. See DSM-IV, p. 42 ("Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with [Intellectual Disability].").
Both Dr. Cunningham and Dr. Hayes opined that Robertson had significant adaptive functioning deficits,[12] relying upon anecdotal descriptions of third parties of Robertson's childhood behavior (lack of social insight, self-direction, and problem-solving ability; gullibility; poor hygiene; failure to follow instructions for household chores, etc...) and historical records (i.e., academic and vocational records), which demonstrated consistent academic underperformance and limited reading, writing, and math abilities.[13] In the cross-examination of Dr. Cunningham, however, the state pointed to the results of an essential skills test, administered as a part of Robertson's vocational education, where he exhibited skills, such as: (1) use of a dictionary, telephone directory, and the classified section of the newspaper; (2) completion of a job application; (3) counting money, telling time, reading a thermometer, using a ruler, and expressing the months in the year in order; (4) and the ability to measure liquid and dry ingredients.
Dr. Vincent and Dr. Hoppe found Robertson had no deficits in adaptive skills, opining that Robertson's academic underperformance was attributable to his (1) drug and alcohol abuse, which began at the early age of 12; (2) neglect and lack of supervision; (3) lack of encouragement or available support; and (4) designation of slow learner and hyperactivity issues. They emphasized that examples of Robertson's childhood behavior reported by family members and friends were not credible or reliable, as these witnesses were likely motivated to see Robertson spared the death penalty. As examples of Robertson's adaptive functioning, they pointed to the results of the Independent Living Skills test administered by Dr. Vincent, in which Robertson answered the following questions and performed the following tasks: (1) correctly explained the purpose of a will; (2) successfully counted money, filled out a money order and gave correct change using pencil and paper; (3) and successfully located information in a phone book. Further, they emphasized Robertson's *274 oral communication skills, as exhibited by recorded jailhouse phone calls, which demonstrated his ability to recall information, including locations and past acquaintances; his use of common phrases ("It is what it is;" "from the get go;" "keep me in the loop;" etc...); and his ability to give relationship advice.
It is also important to consider Robertson's behavior while committing the instant crime as it relates to his adaptive skills functioning. See Dunn , 01-1635, p. 27, 41 So.3d at 471 ; State v. Scott , 04-1312, p. 85 (La. 1/19/06), 921 So.2d 904, 959 ; State v. Brown , 03-0897, p. 46 (La. 4/12/05), 907 So.2d 1, 32. Both Drs. Hoppe and Vincent emphasized Robertson's specific criminal behavior in the instant case in support of their conclusion that Robertson did not meet the criteria for intellectual disability. The evidence at trial indicates that Robertson, the sole perpetrator, was acquainted with the victims and twice entered their residence undetected. He stole a television and sold it for $20 before returning a second time. After Robertson killed both victims, he stole a watch, cash, and car keys and successfully drove the victims' vehicle while eluding an off-duty police officer. He also counted the stolen money and negotiated with witnesses to avoid arrest. The facts of this case therefore suggest that Robertson is capable of pre-meditation, problem-solving skills, and negotiation skills.
The district court, in its discretion, credited the opinions of Drs. Hoppe and Vincent that Robertson was not intellectually disabled, specifically, focusing upon Robertson's adolescent IQ score of 76; his academic records, which indicated no prior diagnosis of intellectual disability; his drug and alcohol abuse as major contributors to his struggles; and the experts' opinion that third party reporting of Robertson's deficits in adaptive behavior were not credible. Instead, the district court reasonably relied upon the experts' opinion that examples of Robertson's skills, shown through the specific criminal activity in the instant case, skills test results, and jailhouse conversations, did not support a finding of limitations in Robertson's ability to adapt to life.
In Brumfield v. Cain , 808 F.3d 1041, 1057 (5th Cir. 2015), cert. denied , --- U.S. ----, 136 S.Ct. 2411, 195 L.Ed.2d 781 (2016), the Fifth Circuit reviewed and affirmed a federal district court's determination that another Louisiana death row inmate, Kevan Brumfield, was intellectually disabled, explaining at the outset:
The determination of whether a defendant is intellectually disabled is inherently an intensively factual inquiry. Because intellectual disability is a factual finding, this court reviews a district court's determination that an individual is intellectually disabled for clear error. A finding is clearly erroneous only if it is implausible in the light of the record considered as a whole. If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. The Supreme Court has explained that: When a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. This court cannot second guess the district court's *275 decision to believe one witness' testimony over another's or to discount a witness' testimony, and is thus reluctant to set aside findings that are based upon a trial judge's determination of the credibility of witnesses.
Brumfield , 808 F.3d at 1057 (internal citations and quotations omitted).
Because the district court's ruling here is supported by the record and based upon ample evidence that Robertson does not meet the criteria for intellectual disability, this court is not persuaded to "second guess the district court's decision to believe [two expert witnesses] over [the others]." Brumfield , 808 F.3d at 1057. Accordingly, the application is denied.
Robertson has now fully litigated several applications for state post-conviction relief. Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana post-conviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4. Notably, the Legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Robertson's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final. Hereafter, unless Robertson can show that one of the narrow exceptions authorizing the filing of a successive application applies, he has exhausted his right to state collateral review. The district court is ordered to record a minute entry consistent with this per curiam.

In the second trial, Robertson conceded his guilt. After conclusion of the state's case-in-chief, the defense rested. Robertson , 97-0177, p. 3 n.2, 712 So.2d at 15.

In preparation for this post-conviction litigation, post-conviction counsel had Robertson examined by Dr. Ricardo Weinstein, a forensic psychologist. Dr. Weinstein undertook a comprehensive review of Robertson's historical records; performed interviews with family members, and conducted a battery of tests, including an IQ test, measuring Robertson's full scale IQ at 67 in 2007. However, Dr. Hayes and Dr. Vincent, experts appointed by the court, testified at the Atkins hearing that there were issues in Dr. Weinstein's initial scoring, and the corrected full scale IQ score would be 70.

Consistent with La. Const. Art. V, § 5 (D), which grants this Court exclusive appellate jurisdiction in cases in which a death sentence has been imposed, and considering that capital cases qualify as "extraordinary" for purposes of La.S.Ct.R. X, § 5(b), this Court has invariably entertained writ applications after a death sentence has been imposed and the petitioner has bypassed the intermediate court of appeal.

This Court applied Atkins in Williams , 01-1650, 831 So.2d 835, and thereafter, the Louisiana legislature enacted La.C.Cr.P. art. 905.5.1 to provide a procedure when a defendant facing capital punishment claims to be intellectually disabled, before trial . The dictates of Williams still govern post-conviction intellectual disability claims in cases, like this, in which the death sentence pre-dates Atkins . See State v. Dunn , 07-0878, p. 6 (La. 1/25/08), 974 So.2d 658, 662 (because the legislature has not enacted a procedure for post-sentencing Atkins claims, the law in such cases remains as it was when Williams was decided).

Dr. Cunningham, a clinical and forensic psychologist, interviewed 18 people, including Robertson, his mother, his brothers and sisters, his sons and daughters, his partner, his inmate counselor, distant relatives, and family friends. He additionally reviewed the reports and raw data of the other experts; the videotaped interview of Robertson with Dr. Jill Hayes; the case record; Robertson's criminal record, education records, Department of Corrections records; and the video and audio of Robertson's confessions.

Dr. Jill Hayes, a clinical and forensic neuropsychologist, reviewed audiotapes of Robertson's recorded jailhouse phone calls, school records, medical records, and the reports of the other experts. Assisted by Dr. Catherine Lolling, Dr. Hayes also interviewed Robertson, his family members, and Angola staff. She also administered the WAIS-4 IQ test to Robertson.

Dr. Vincent, a clinical psychologist, reviewed the trial transcripts, the pre-sentencing investigation report, raw data from other experts, administered the Independent Living Skills test to Robertson, and administered the ABAS (Adaptive Behavior Assessment System) questionnaire to Robertson, his mother, and his nephew.

Dr. Hoppe, a state licensed psychologist, administered the Wide Range Achievement Test (WRAT); conducted interviews with Robertson, Robertson's mother, and his nephew; and reviewed all available records and the reports of the other experts.

TEST YEAR (AGE) MEASURED IQ IQ WITH SEM WAIS 1984 (16) 76 71-81 WAIS-R 1995 (27) 74 69-79 SB-5 2007 (37) 70 65-75 WAIS-IV 2012 (44) 73 68-78

In Williams , this Court held that "to qualify as significantly sub-average in general intellectual functioning in Louisiana, one must be more than two standard deviations below the mean for the test of intellectual functioning." Williams , 01-1650, p. 23, 831 So.2d at 853. The Wechsler Adult Intelligence Scale test (WAIS) is commonly administered and utilizes a mean score of 100 with a standard deviation of 15. Id. Thus, two standard deviations below average is a score of 70. Hall [v. Florida] , 572 U.S. ----, 134 S.Ct. [1986] at 1994[, 188 L.Ed.2d 1007 (2014) ].

Both the United States Supreme Court and Louisiana law reject a bright-line numerical cutoff for IQ scores. See Hall , 572 U.S. ----, 134 S.Ct. at 1999 ; Williams , 22 So.3d at 888. As this Court recognized in Williams , "the assessment of intellectual functioning through the primary reliance on IQ tests must be tempered with attention to possible errors in measurement." Williams , 01-1650 p. 23, n. 26, 831 So.2d at 853; see also DSM-IV, p. 31 ("It should be noted that there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument (e.g. , a Wechsler IQ of 70 is considered to represent a range of 65-75.").

According to the American Association on Intellectual and Developmental Disabilities (AAIDD), an intellectual disability diagnosis requires significant limitations in at least one of three domains of adaptive skills: conceptual, social, and practical skills.

Records of St. Agnes Vocational School, where Robertson was referred at age 17, reveal that Robertson was designated with the disability of "slow learner."